IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

ROBERT J. FOSTER, *Appellant*.

No. 1 CA-CR 23-0370

FILED 11-07-2024

Appeal from the Superior Court in Maricopa County
No.  CR2019-031015-001
The Honorable Lisa Ann VandenBerg, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric K. Knobloch
*Counsel for Appellee*

Piccarreta Davis Keenan Fidel, PC, Tucson
By Michael L. Piccarreta, Louis S. Fidel, Jefferson L. Keenan
*Counsel for Appellant*

**OPINION**

Presiding Judge Daniel J. Kiley delivered the opinion of the Court, which
Chief Judge David B. Gass joined. Judge Kent E. Cattani dissented.

**K I L E Y**, Judge:

¶1        A jury convicted Robert J. Foster of leaving the scene of a fatal accident in violation of A.R.S. § 28-661. He argues that the superior court abused its discretion in instructing the jury and in several evidentiary rulings. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        On August 3, 2019, a BMW collided with a Toyota Camry at the intersection of Williams Drive and Miller Road (hereinafter, "Hayden/Miller")[1] in Scottsdale. The collision killed the driver of the Toyota and injured the BMW's passenger.

### A.        The Collision

¶3        Viewed in the light most favorable to sustaining the jury's verdict, *see State v. Rios*, 255 Ariz. 124, 127, ¶ 2 (App. 2023), the evidence shows that, at the time of the collision, Ramon Carrasco was driving the BMW at a speed exceeding 100 mph, more than double the posted speed limit of 45 mph. Eyewitnesses reported seeing the BMW "racing" a blue Lamborghini before the BMW struck the Toyota. Foster was driving the Lamborghini.

¶4        Before the collision, the Lamborghini and the BMW had been traveling north on Hayden/Miller when they stopped side-by-side at a red light at the Thompson Peak Parkway intersection. According to the BMW's passenger, "Jenny" (a pseudonym), Foster looked over at the BMW and gave "a thumbs up and a head nod," and Carrasco nodded back. When the light turned green, the cars accelerated simultaneously, "going fast." Jenny described the cars as playing a game of "cat and mouse," "accelerating together and then braking and then accelerating," like a "teasing type of thing."

¶5        Continuing north, Foster and Carrasco stopped side-by-side at another red light at the intersection with Deer Valley Road. Witness Jessica V., who was stopped at the same intersection, heard "the two cars revving their engines." When the light turned green, the Lamborghini and the BMW "took off again," driving "very fast."

---

[1] Evidence at trial showed that the street's name changes from Hayden Road to Miller Road when it intersects with Deer Valley Road. For clarity's sake, we will refer to the roadway as "Hayden/Miller."

¶6         Jenny, who was watching a video on her phone, looked up when she realized that "this acceleration was lasting longer than the previous ones." Turning to her left, she saw Foster's Lamborghini through the BMW's left rear window, with its "front end" by the BMW's left rear tire. She then heard Carrasco yell, "Oh, fuck!" Looking forward again, she saw the Toyota turning left in front of the BMW. The cars collided, creating what bystanders later described as an "explosion," with "smoke" and "parts . . . flying everywhere." After the collision, multiple witnesses saw Foster's blue Lamborghini "speeding" away west on Williams Drive.

¶7         Several other motorists stopped at the collision site to offer assistance. Carrasco and Jenny were helped out of the BMW before it burst into flames. The driver of the Toyota, "Laura" (a pseudonym), died at the scene.

### B.      The Investigation

¶8         Law enforcement quickly arrived at the scene. Several eyewitnesses told the responding officers that the BMW had been "racing" a "blue Lamborghini" with "a first responder plate or a plate that had a blue and a red line on it." Video from a nearby "photo radar site" showed a "light blue Lamborghini" shortly after the collision. After searching registration records, a Scottsdale police detective identified a blue Lamborghini with a first responder plate that was registered to a nearby business owned by Foster. The general manager of a Lamborghini dealership in Scottsdale confirmed that the vehicle had been sold to Foster.

¶9         On August 15, 2023, police placed Foster's home under surveillance. Later that day, two detectives saw Foster leave his home driving a red pickup truck. They instructed a motorcycle officer in the area "to observe [Foster] for any traffic violations and then make an appropriate stop." After seeing the truck drive past a stop sign without coming to a complete stop and then travel approximately 10 mph over the posted speed limit, the motorcycle officer initiated a traffic stop. As he asked Foster for his license, registration, and proof of insurance, the two detectives arrived at the scene and parked behind Foster's truck. Foster later testified that when he saw "two plain clothes detectives" getting out of their vehicle, he "became very nervous," explaining, "I had a feeling of why they were contacting me at that point."

¶10         Detective Johnson approached Foster and stated that he was "investigating a fatal accident that occurred on August 3" at the intersection of "Miller and Williams." He asked if Foster was "familiar with that

accident at all," and Foster replied, "I really shouldn't say anything." The detective then told him that witnesses had seen his Lamborghini near the collision. Foster replied, "I really don't want to say anything. I saw a kid driving crazy." When asked to clarify, Foster elaborated that the "kid" was driving "pretty fast" and "had a fast crazy car." Detective Johnson then asked if he saw the collision; Foster responded that he "turned before the crash." Foster then invoked his right to counsel, at which point the detective arrested him. Detective Johnson's conversation with Foster at the scene lasted less than five minutes.

### C.    Legal Proceedings

**¶11**        The State charged both Foster and Carrasco with second-degree murder and aggravated assault in connection with Laura's death and Jenny's injuries. Foster was also charged with leaving the scene of a fatal accident. The two men were tried separately.

**¶12**        Before trial, Foster moved to suppress the statements he made during the traffic stop, arguing they were obtained as a result of an unlawful detention. After an evidentiary hearing, the court suppressed certain statements Foster made after his arrest but denied his motion to suppress his pre-arrest statements during the traffic stop.

**¶13**        Foster also filed a motion *in limine* seeking leave to present evidence that Carrasco had a poor driving history (including six speeding tickets and a license suspension), was involved in a street racing club, and had tetrahydrocannabinol ("THC") in his system at the time of the collision. Foster argued that such evidence was admissible because it concerned the culpability of a third-party, noting his "constitutional right to be afforded a meaningful opportunity to present evidence in his defense" and asserting that the evidence shows Carrasco was "the sole cause of the accident." After a hearing, the court denied Foster's request.

**¶14**        The superior court conducted an 11-day jury trial between April 18, 2023, and May 10, 2023. The State called Jenny as a witness, who testified to the events described in ¶¶ 4-7 above. The State called eleven other eyewitnesses to testify about the collision and Foster's driving before and immediately afterwards. One such eyewitness, Jessica P., testified that she was driving home that day when she turned left at the intersection of Hayden/Miller and Williams Drive and, while driving south on Hayden/Miller, saw two northbound cars driving "next to each other" while "racing." "They were going really fast," she stated, "and they zoomed past me." Explaining that she works at a "[r]ace car performance shop" and

has experience "in dragster racing," Jessica P. estimated that the two cars were going "between 115 and 120" mph on Hayden/Miller as they drove toward the Williams Drive intersection.

¶15        Another eyewitness, Beli M., testified that he saw the BMW and the Lamborghini driving at "extreme speeds" on Hayden/Miller. When he realized "they were racing," he stated, he "hit the horn" and yelled, "What are you doing, idiots?"

¶16        Joanne P. testified that she saw the Lamborghini and BMW "pull[] up next to" each other at the "intersection at [Hayden/Miller] and Thompson Peak" and then "accelerate[] quickly from the light," traveling "much faster than would be normal for [the] area." The cars stopped at the intersection of Deer Valley Road; when the light changed, they accelerated again at a high rate of speed. Joanne P. recalled remarking that the cars were driving so fast that she feared "[s]omething really bad" might happen. Moments later, she saw what "looked like an explosion in the intersection." Joanne P.'s husband Frank P. likewise testified that after watching the cars engaging in a "drag race," he saw "a giant cloud of smoke" at the intersection of Hayden/Miller and Williams Drive. He further stated that, as he reached the intersection, "the smoke or whatever was obscuring the intersection finally dissipated," and he could see "the Lamborghini . . . going down Williams [Drive]."

¶17        The State's accident reconstruction expert, Detective Strohmeyer, testified that the BMW was traveling at a speed of approximately 140 mph about three-and-a-half seconds before the collision. On redirect, the State asked Strohmeyer, "Is your testimony here today that the crash would not have happened had the BMW not been racing the Lamborghini?" Foster objected on several grounds. After the court overruled Foster's objection, Strohmeyer stated:

> The reconstruction shows that the BMW was going 102 to 106 [mph] at impact. The [analysis] shows that it was doing 142 prior to that. If those speeds weren't there, the crash wouldn't have happened. As a reconstructionist, I can't answer to what he was doing prior to that.

¶18        The State then asked whether Strohmeyer had "looked at this case as an investigator," to which he answered, "Yes." The State asked whether that fact would "adjust [his] answer in any way." Foster re-asserted his prior objections, which the court again overruled. Strohmeyer

5

responded, "My opinion that they were racing and that the crash wouldn't have happened if they were not racing? Yes."

¶19         Accident reconstruction expert Charles Dickerson testified for the defense. Among other things, Dickerson testified that because the Lamborghini successfully negotiated the turn from Hayden/Miller onto Williams Drive, it could not have been traveling at a speed greater than 39 mph when it reached the intersection.

¶20         Foster testified on his own behalf. He denied "racing" the BMW. He admitted, however, that while the two cars were stopped at a traffic light on Hayden/Miller, the driver of the BMW "gave [him] a thumbs-up or something like that" and he "[p]robably waved" back in response. When "[t]he BMW took off," Foster admitted, "I did accelerate after he took off." Foster explained that he "floored" the accelerator and "accelerate[d] hard." He insisted, however, that he only accelerated for "maybe three or four seconds" before slowing down because he saw the traffic light at the upcoming Deer Valley Road intersection "turning red." The two cars stopped at that intersection, Foster testified, and when the light changed, he "accelerated hard" while the BMW "took off too." Foster acknowledged that he was "showing off" but asserted that he "took [his] foot off the gas pedal" after only "five to six seconds" of acceleration, and so the BMW began "pulling away from [him]." Even though he was no longer accelerating, however, Foster admitted that he was "going over the speed limit" by "[p]robably quite a bit" as he approached the Williams intersection. He "guess[ed]" that he was 300 to 400 feet from the intersection when, he stated, he "saw some sort of . . . explosion."

¶21         Foster testified that he had intended to continue straight on Hayden/Miller at the intersection but, upon seeing the "explosion," he decided, "in a split second," to turn left at the intersection. He also decided, he admitted, not to pull over and stop at the scene. He testified that he "knew [he] didn't have to stop from a legal standpoint" because he "was not involved in the collision." "[A]fter thinking about it," however, he "felt" that driving away was "the wrong decision from a moral standpoint." He expressed remorse for the manner in which he drove before the collision, stating, "I drove fast and I regret that."

¶22         The jury found Foster guilty of one count of leaving the scene of a fatal accident but not guilty of second-degree murder (and all lesser-included homicide offenses) and not guilty of aggravated assault. The jury also found that Foster did not "cause" the accident, a finding that

established the offense as a class 3 rather than a class 2 felony. *See* A.R.S. § 28-661(C). The court placed Foster on three years' probation.

¶23 Foster timely appealed. We have jurisdiction. *See* Ariz. Const. art. 6, § 9; A.R.S. §§ 12-120.21(A)(1), 13-4033(A)(1).

## DISCUSSION

¶24 Foster was convicted of violating A.R.S. § 28-661(A),[2] which requires a driver of a vehicle "involved" in a fatal accident to:

1. Immediately stop the vehicle at the scene of the accident or as close to the accident scene as possible but shall immediately return to the accident scene.

2. Remain at the scene of the accident until the driver has fulfilled the requirements of § 28-663.

Section 28-663, in turn, requires the driver of a vehicle involved in a fatal accident to (1) "[g]ive the driver's name and address and the registration number of the vehicle the driver is driving," (2) "[o]n request, exhibit the person's driver license to the person struck or the driver or occupants of or person attending a vehicle collided with," and (3) "[r]ender reasonable assistance to a person injured in the accident." A.R.S. § 28-663(A).

## I.    Jury Instructions

¶25 Foster argues that the superior court gave erroneous jury instructions and, further, abused its discretion by refusing to give an instruction that he requested. "We review a trial court's decision to give a jury instruction for an abuse of discretion." *State v. Ewer*, 254 Ariz. 326, 329, ¶ 10 (2023) (citation omitted). "We review de novo whether a trial court properly instructed the jury, and whether the jury instructions properly state the law." *Id.* (cleaned up). "We do not assess jury instructions in a vacuum, instead looking to the instructions as a whole and in conjunction with counsel's closing argument." *State v. Rix*, 256 Ariz. 125, 137, ¶ 38 (App. 2023). "The sole purpose of jury instructions is to correctly inform jurors of the applicable law." *Id.* "Erroneous jury instructions are subject to a

---

[2] We cite the current version of A.R.S. §§ 28-661 and -663. Although each statute has been amended since Foster committed the offense, the amendments do not affect our analysis.

harmless error analysis." *State v. Dann*, 205 Ariz. 557, 565, ¶ 18, *supplemented*, 206 Ariz. 371 (2003).

### A.    "Involvement in Collision" Instruction

**¶26**        The offense of leaving the scene of a fatal accident requires the State to prove, among other things, that the defendant was "driving a vehicle involved in an accident." *See* A.R.S. § 28-661(A). Consistent with Section 28-661(A), the superior court instructed the jury that "[t]he crime of leaving the scene of a fatal accident requires that the defendant . . . [w]as driving a vehicle involved in an accident" resulting in a death and "[f]ailed or refused to remain at the scene" until the defendant had fulfilled his legal duties.

**¶27**        The court also gave the following instruction on the "involvement" element of the offense:

> Involvement in Collision: A driver who races another driver who collides with a third car, may be found to have actively participated in the immediate chain of events culminating in the collision and, by any measure, have been a participant and implicated and entangled in the accident for purposes of leaving the scene of an accident including injury or death without regard (or condition upon) actual physical contact with the struck vehicle [*sic*].

**¶28**        Foster challenges the "Involvement in Collision" instruction on various grounds, including that it purportedly "misstate[d] the law" by defining "involvement" incorrectly.

**¶29**        Although the word "involved" is not defined in Title 28, we have defined "involve" according to its ordinary meaning as "entangle," "implicate," or "draw in as a participant." *State v. Korovkin*, 202 Ariz. 493, 497, ¶ 15 (App. 2002) (quoting Webster's Third New International Dictionary 1191 (1971)). In *Korovkin*, the defendant drove from the scene after racing another car that struck a third car, causing a fatality. 202 Ariz. at 494, ¶¶ 2-3. The defendant appealed his conviction for violating A.R.S. § 28-661(A), arguing that he was not "involved" in the accident as required by the statute because "the car he was driving was not physically part of the collision." *Id*. at 497, ¶¶ 13-14. The Court held that "involvement" for purposes of A.R.S. § 28-661 did not require physical contact, stating,

> a driver who races another driver who collides with a third
> vehicle actively participates in the immediate chain of events

culminating in the collision and, by any measure, has been a participant and is implicated and entangled in the accident, notwithstanding any absence of actual physical contact with the struck vehicle.

*Id.* at 497, ¶¶ 14-15. The challenged "Involvement in Collision" instruction was taken from this passage in *Korovkin*.

**¶30** Foster complains that the challenged instruction "is not an approved jury instruction." Citing "the dangers of basing jury instructions on isolated, selective quotes from appellate decisions," Foster argues that the language in *Korovkin* used in the challenged instruction was nothing more than an observation relating only to "the specific facts of that case."

**¶31** Although appellate opinions are a useful reference in crafting jury instructions, this Court has discouraged verbatim quotes from opinions, in part because opinions often contain legal terms that may confuse the jury. *See State v. Martinez*, 175 Ariz. 114, 120 (App. 1993). Instructions should express legal principles in everyday language. *Id.* Moreover, legal principles and conclusions set forth in opinions are often case-specific. Quoting verbatim from holdings premised on dissimilar facts risks importing reasoning that is inapplicable to the case before the jury.

**¶32** Nevertheless, giving an instruction containing language taken from case law is not error as long as it properly reflects the law. *State v. Rutledge*, 197 Ariz. 389, 392, ¶ 11 (App. 2000). Here, the challenged instruction informed the jury that criminal liability *may* attach to a driver who "actively participated in the immediate chain of events culminating in the collision," and that Foster "may be found to . . . have" been a participant "in the accident for purposes of leaving the scene of an accident" under Section 28-661 even if his vehicle did not physically collide with another. The challenged instruction thus accurately reflects Arizona law as set forth in *Korovkin*. The fact that it mirrored language from an appellate opinion does not automatically render the instruction improper.

**¶33** Foster argues that *Korovkin* is distinguishable, and so the challenged instruction was inapposite, because unlike the racing drivers in that case, Foster "was not traveling side-by-side with [Carrasco] at a high rate of speed through the same intersection when [Carrasco] collided with [Laura's] vehicle."

**¶34** But nothing in *Korovkin* limits its application to situations where two racing drivers are "side-by-side" when one of them strikes a third vehicle. Instead, by explaining that the term "involved" may refer to

"being part of, contributing to and being a participant," *Korovkin* makes clear that criminal liability is based on the conduct of the racing drivers rather than the location of their vehicles at the time of the collision. 202 Ariz. at 497, ¶ 16 (citation omitted).

¶35          Noting, correctly, that "whether a motorist was, in fact, 'involved' in an accident is an essential element of the offense," Foster argues that the challenged instruction incorrectly told the jury that "any driver 'who races another driver' is 'involved' in any accident the other driver may be involved in, no matter when the 'racing' may have stopped." As a result, he contends, the challenged instruction essentially "directed the jury to find for the state on this issue."

¶36          Foster mischaracterizes the challenged instruction. The instruction does not, as Foster contends, tell the jury that Foster was "involved" in the collision if he "raced" Carrasco at any point beforehand. On the contrary, as noted above, the instruction defined "involvement" for purposes of Section 28-661 as "active[] participat[ion] in the immediate chain of events culminating in the collision." This definition is consistent not only with *Korovkin*, but with numerous other cases construing statutes like Section 28-661. *See, e.g.*, *State v. McClain*, 880 S.E.2d 889, 896-98 (W. Va. 2022) (holding that a vehicle's being "involved" in a crash under leaving-the-scene statute did not require physical contact and stating that "involved" means "having a part in something" or "connected or concerned with . . . something") (citations omitted); *Comstock v. State*, 573 A.2d 117, 122 (Md. Ct. Spec. App. 1990) (holding that defendant could be found to be "involved" in an accident for purposes of leaving-the-scene statute when the fatal collision was "a natural consequence" of defendant's abrupt lane change, which caused other motorist to swerve into oncoming traffic); *People v. Bammes*, 71 Cal. Rptr. 415, 418-19 (Cal. Ct. App. 1968) (holding that defendant's vehicle was "involved" in collision between two other vehicles for purposes of leaving-the-scene statute when defendant's left turn in front of the other vehicles forced their evasive action resulting in their colliding; because "involvement" under leaving-the-scene statute includes "connection" with the accident in a "natural or logical manner," "[o]ne can be involved . . . in an accident without being its legal cause") (citations omitted).

¶37          In a related vein, Foster contends that the challenged instruction "constituted an improper comment on the evidence" by "endors[ing] the state's argument on a highly contested issue in the case." Thus, he maintains, the instruction violated "Arizona's explicit constitutional prohibition against judges commenting on the evidence."

¶38        The Arizona Constitution prohibits judges from interfering with a jury's independent evaluation of the evidence. Ariz. Const. art. VI, § 27. A court "violate[s] Arizona's constitutional prohibition against commenting on the evidence" if it "express[es] an opinion as to what the evidence proves." *State v. Rodriguez*, 192 Ariz. 58, 63, ¶ 29 (1998).

¶39        Here, the challenged instruction did not purport to tell the jury what the evidence proved. Instead, it told the jury that it *could*—not that it *must*—find a "driver who races another driver who collides with a third car" to have "actively participated in the immediate chain of events culminating in the collision." The instruction thus correctly stated the law and left it to the jury to determine whether Foster "actively participated in the immediate chain of events culminating in a collision." We reject Foster's contention that the challenged instruction told the jury what conclusions to draw or otherwise constituted an improper comment on the evidence.

### B.     Mens Rea Instruction

¶40        Section 28-661 does not specify a mens rea for the felony offense of leaving the scene of a fatal accident. Nevertheless, Arizona courts have long recognized that the statute does not create a strict liability offense. *See State v. Lee*, 53 Ariz. 295, 301 (1939) (holding that a driver cannot be criminally liable for leaving the scene of an accident unless the State alleges and proves that the driver "knew that the collision had occurred"); *State v. Porras*, 125 Ariz. 490, 493 (App. 1980) (holding that a driver cannot be criminally liable for leaving the scene of an accident unless the State proves a defendant had either actual or constructive knowledge that the accident caused injury to another).

¶41        The court gave the following mens rea instruction:

> The State must prove that the defendant actually knew of the injury to another or that the defendant possessed knowledge that would lead to a reasonable anticipation that such injury had occurred.

¶42        Foster contends that this instruction misstated the law by omitting an "essential element" of the offense of leaving the scene of a fatal accident—namely, "knowledge of involvement in the accident." Citing case law from other jurisdictions, Foster maintains that the "overwhelming weight of authority" recognizes that "a motorist must have knowledge of involvement in an accident" to be criminally liable for leaving the scene. Foster's argument raises a question of statutory construction subject to de novo review. *See State v. Holle*, 240 Ariz. 300, 302, ¶ 8 (2016).

¶43            We agree with Foster that "knowledge of involvement in the accident" is an element of the crime established by Section 28-661. Interpreting the statute to require the State to prove a defendant's knowledge of his or her involvement in an accident is consistent with our court's recognition that "[c]ommon sense and justice alike revolt at the idea that a man may be held criminally responsible for something which he does not even know he has done." *Porras*, 125 Ariz. at 492 (citation omitted). Further, to interpret the statute in this manner is consistent with a purpose of Section 28-661: "to prohibit drivers from seeking to evade civil or criminal liability by escaping before their identity can be established." *State v. Rodgers*, 184 Ariz. 378, 380 (App. 1995). That purpose would not be served by imposing criminal liability upon a driver who is unaware of the facts making his or her departure from an accident scene unlawful. *See Clancy v. State*, 313 P.3d 226, 230 (Nev. 2013) (noting that a hit-and-run statute's purpose "is not served where the driver is unaware of the event requiring him to stop and provide identifying information and render assistance").

¶44            We further agree with Foster that the mens rea instruction was deficient. The instruction told the jurors that the State was required to prove only that Foster knew or should have known "of the injury to another," without informing them that the State was required to prove Foster's knowledge of any other fact surrounding the accident. By failing to instruct the jury that the State must prove Foster's knowledge of *all* of the facts that establish his criminal liability under Section 28-661, the instruction was incomplete, and therefore erroneous.

¶45            Nevertheless, giving an instruction that omits an element of the offense may be harmless error if the facts establishing the missing element are undisputed. *State v. Fullem*, 185 Ariz. 134, 138 (App. 1995) ("Arizona has traditionally followed the rule that the failure to instruct the jury on an essential element of an offense is not fundamental error where there is no issue as to that element."). Failure to instruct the jury on the mens rea required to commit the charged offense is subject to harmless error review. *See Neder v. United States*, 527 U.S. 1, 15 (1999) (subjecting jury instruction that omitted element of an offense to harmless error review); *see also State v. Yazzie*, 232 Ariz. 615, 617-18, ¶¶ 10-12 (App. 2013) (conducting harmless error review after concluding "the court did not instruct jurors regarding an element of the offense that the State was required to prove beyond a reasonable doubt").

¶46            To be criminally liable under Section 28-661, a driver must know that an accident occurred, know or have reason to know that injury had resulted, and be aware of his own actions that establish his

participation in the events culminating in the accident. Here, Foster never claimed to lack knowledge of his own actions. Although he denied "racing" the BMW, he admitted he exchanged non-verbal communications with its driver when the vehicles were stopped side-by-side, and that, when the BMW "took off," he "floored" his gas pedal as well. The two vehicles stopped next to each other at a red light at the next intersection, Foster testified, and when the light changed, he again "accelerated hard" while the BMW "took off too." Foster further admitted that he was "showing off." Foster never disputed that he knew that the BMW was involved in an accident, nor did he dispute that the severity of the accident—which he described as an "explosion"—put him on notice of the likelihood of injury. Foster thus knew all of the facts that establish his participation in events culminating in a fatal accident. Under these circumstances, the failure to instruct the jury that the State had to prove that Foster "knew" these undisputed facts, though error, was harmless. *See Fullem*, 185 Ariz. at 138; *see also Neder*, 527 U.S. at 17 ("[W]hen a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.").

¶47　　Foster denies that his knowledge of the relevant facts was undisputed, insisting that his "knowledge of [his] involvement in an accident" was "highly disputed." In support of his argument, Foster cites his own testimony that he believed he "didn't have to stop from a legal standpoint" because he "knew [he] wasn't actually involved in the accident."

¶48　　Foster's argument conflates two distinct concepts: (1) knowledge of the relevant *facts* surrounding the accident and (2) knowledge of the *legal significance of those facts*, *i.e.*, that those facts establish Foster's "involvement" in the accident as the term is used in A.R.S. § 28-661. While a defendant's knowledge of the relevant facts surrounding the fatal accident is indisputably an element of the offense set forth in Section 28-661, a defendant's appreciation of the legal significance of those facts, *i.e.*, that they establish a violation of Section 28-661, is not an element of the offense. *See generally Bryan v. United States*, 524 U.S. 184, 192-93 & n.14 (1998) (explaining that "the knowledge requisite to knowing violation of a statute" is "knowledge of the facts that constitute the offense") (cleaned up); *see also State v. Romero*, 248 Ariz. 601, 604, ¶ 12 (App. 2020) (noting "criminal law's general indifference to whether a defendant knows an act is criminal").

¶49 Whether Foster was aware of it or not, Arizona law has long recognized that a driver who engages in a contest of speed with another vehicle may be criminally liable under Section 28-661 if he leaves the scene after the other driver collides with a third vehicle. *Korovkin*, 202 Ariz. at 494-95, 498, ¶¶ 2-3, 30. The State was not required to prove, and thus the court was not required to instruct the jury, that Foster was aware that his conduct violated the statute. *See State v. Morse*, 127 Ariz. 25, 31 (1980) ("[L]ack of knowledge that one's conduct violated the law is no defense to criminal liability."); *see also State v. Cumpton*, 1 P.3d 429, 432, ¶ 15 (N.M. Ct. App. 2000) (conviction for violating leaving-the-scene statute requires showing that the defendant had "knowledge . . . *of the factual circumstances* of the incident") (emphasis added).

¶50 Because Foster never disputed his knowledge of the facts giving rise to his criminal liability, we hold that court's error in giving the incomplete mens rea instruction was harmless. We reject, as without support in the law, Foster's contention that the superior court should have instructed the jury that the State was required to prove that Foster understood that his driving that culminated in the fatal collision constituted "involvement" in a collision within the meaning of Section 28-661. In other words, the State was not required to prove that Foster knew that his actions were prohibited by statute, and the court's failure to instruct the jury to that effect entitles Foster to no relief.

## C. Withdrawal Instruction

¶51 Foster argues that the superior court erred by refusing to give a jury instruction describing his "theory of defense," *i.e.*, that even if he had been "racing" Carrasco, he withdrew from the race before the fatal accident. We review the refusal to give a jury instruction for abuse of discretion. *State v. Hurley*, 197 Ariz. 400, 402, ¶ 9 (App. 2000).

¶52 Foster requested the following instruction, entitled "Withdrawal from Racing (Theory of Defense)":

> If two parties are racing and one withdraws prior to the time the other kills or injures a third party as a proximate result of his speed, the party who withdrew is not criminally responsible for the death of or injury to the third party.

¶53 Foster argues that the court erred in rejecting his proposed withdrawal instruction because, he contends, it was "clearly supported by the evidence." The evidence shows, he argues, that he "slowed down" as he approached the intersection of Hayden/Miller and Williams Drive.

Accordingly, Foster contends, "[e]ven if [his] prior driving behavior could be characterized as 'racing,' he had ceased any such activity well before the fatal accident occurred."

¶54        Foster's proposed instruction would have informed the jury that a motorist who timely withdraws from a race with another driver is not criminally liable for the "death of or injury to" a third party. But the jury *acquitted* Foster of all charges relating to Laura's death and Jenny's injuries. Because Foster's proposed instruction related only to the charges of which Foster was acquitted anyway, the failure to give the proposed instruction could not have "contribute[d] to or affect[ed] the verdict." *State v. Solis*, 236 Ariz. 285, 287, ¶ 13 (App. 2014) (citation omitted). Foster is entitled to no relief from the superior court's failure to give an instruction which, by its terms, applied only to charges of which he was acquitted.

### D.        Flight Instruction

¶55        The court gave the jury the following instruction:

**Flight or Concealment**

In determining whether the State has proved the defendant guilty beyond a reasonable doubt, you may consider any evidence of the defendant's running away, hiding, or concealing evidence, together with all the other evidence in the case. Running away, hiding, or concealing evidence after a crime has been committed does not by itself prove guilt.

¶56        Foster argues that the superior court erred by giving this instruction to the jury, asserting that it constituted an improper comment on the evidence because "it mimicked the elements of one of the offenses charged against [Foster], *i.e.*[,] leaving the scene."[3] According to Foster, the instruction improperly "told the jury that evidence of 'leaving the scene'

---

[3] Foster alternatively argues that "due to the many problems associated with flight instructions, Arizona courts should join the ranks of other jurisdictions that have dispensed with the giving of such instructions altogether." He acknowledges, however, that the Arizona Supreme Court has found that flight or concealment instructions are appropriate under certain circumstances, *see State v. Weible*, 142 Ariz. 113, 116-17 (1984), and explains he is merely preserving the issue for review. Because we are bound by the decisions of the Arizona Supreme Court, *see State v. Brahy*, 22 Ariz. App. 524, 525 (App. 1974), we do not address this alternative argument.

can be considered in determining whether the state has proved [Foster] guilty beyond a reasonable doubt of 'leaving the scene of an accident.'"

¶57 Foster's argument overlooks the fact that the flight instruction applied to the two other charged offenses, second-degree murder and aggravated assault. If Foster believed that the jury could not properly have considered the flight instruction in connection with the leaving-the-scene charge, he could have requested a limiting instruction to that effect. He did not, and his failure to request a limiting instruction warrants denying him relief on this claim. *See State v. Bolivar*, 250 Ariz. 213, 219, ¶ 14 (App. 2020) (failing to propose or request a limiting instruction at trial waives the issue on appeal absent fundamental error).

¶58 Foster next argues that the facts did not justify giving a flight instruction because "[t]here was no immediate pursuit, there was no concealment or attempted concealment," and Foster's "actions did not make him harder to find or camouflage his activities." Instead, he "simply proceeded home." In response, the State contends that "the flight instruction was appropriate because the trial evidence showed that Foster concealed or attempted to conceal himself to avoid arrest."

¶59 To determine whether the State has presented evidence to support a flight instruction, courts apply the two-part test outlined by the Arizona Supreme Court in *State v. Smith*, 113 Ariz. 298, 300 (1976). "First, the evidence is viewed to ascertain whether it supports a reasonable inference that the flight or attempted flight was open, such as the result of an immediate pursuit." *Id.* If there is no open flight or attempted flight, "the evidence must support the inference that the accused utilized the element of concealment or attempted concealment." *Id.* In other words, the test requires "evidence [that] allows [the] jury to be able to reasonably infer from the evidence that the defendant left the scene in a manner which obviously invites suspicion or announces guilt." *Solis*, 236 Ariz. at 286-87, ¶ 7 (cleaned up). "We review the trial court's decision to give a flight instruction for abuse of discretion." *State v. Parker*, 231 Ariz. 391, 403, ¶ 44 (2013).

¶60 Here, the record contains sufficient evidence to support an inference that Foster "utilized the element of concealment or attempted concealment." *Smith*, 113 Ariz. at 300. Foster admitted at trial that upon seeing the accident he deviated from his intended route along Hayden/Miller and instead turned left at the intersection. Several witnesses described Foster driving away from the intersection at a high rate of speed. Foster's benign characterization of his actions as "simply

proceed[ing] home" provides an alternative explanation for his leaving the intersection but does not preclude the giving of a flight instruction. *See Parker*, 231 Ariz. at 404, ¶ 50 (observing that defendant's alternative "explanation for his flight did not preclude the trial court from giving a flight instruction" but "simply created a fact question for the jury to decide"). Further, Foster testified that the traffic stop did not make him nervous until he saw the two detectives, at which point he became "very nervous." From this, a reasonable jury could infer Foster's consciousness of guilt regarding his decision to leave the scene. *See State v. Medeiros*, 997 A.2d 95, 97, 101, ¶¶ 4, 25 (Me. 2010) (noting that truck driver's "panicked" demeanor when stopped by law enforcement supported inference that he knew that accident had occurred after load "fell off [his] trailer and into the road"). Because Foster's actions may invite "some suspicion of guilt," *see Parker*, 231 Ariz. at 404, ¶ 48 (citation omitted), the superior court did not abuse its discretion by giving the flight or concealment instruction.

¶61        Foster next asserts that the instruction "violated due process by eliminating [his] presumption of innocence" and "by lessening the [State's] burden of proof beyond a reasonable doubt." The State responds that "[t]he instruction was permissive in nature," noting that, "it was within the jurors' discretion to 'consider' the evidence showing that Foster had fled from the fatal crash and then concealed himself by avoiding police for two weeks."

¶62        "In assessing the constitutionality of jury instructions dealing with presumptions, we must first determine if the presumption is mandatory or permissive." *State v. Abdi*, 226 Ariz. 361, 364, ¶ 9 (App. 2011). "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts," while "a permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Peraza*, 239 Ariz. at 147-48, ¶¶ 28-29 (cleaned up). And while "[m]andatory presumptions represent an impermissible burden shift when they relieve the State of the burden of persuasion on an element of an offense," *id.* at 147, ¶ 28 (cleaned up), "[t]he use of a permissive presumption is constitutional if there is a rational connection between the predicate and presumed facts." *State v. Platt*, 130 Ariz. 570, 574 (App. 1981).

¶63        Here, the challenged instruction stated that "[i]n determining whether the State has proved the defendant guilty beyond a reasonable doubt, [the jury] *may* consider any evidence of the defendant's running away, hiding, or concealing evidence." It expressly informed the jury that flight or concealment "does not by itself prove guilt." Interpreting this

language "as a reasonable juror could have interpreted it," *see State v. Grilz*, 136 Ariz. 450, 457 (1983), the instruction cannot reasonably be interpreted as imposing a mandatory presumption. It did not instruct the jury that evidence of flight or concealment, without more, could establish guilt, *see Platt*, 130 Ariz. at 574 (explaining nature of mandatory presumptions), but instead merely informed the jury that it "may consider any evidence" of "running away" in determining guilt. *See also State v. Tegart*, 2 CA-CR 2015-0450, 2016 WL 4395348, at *2, ¶ 5 (Ariz. App. Aug. 17, 2016) (mem. decision) (describing flight instruction as instructing on a permissive inference). The instruction, in other words, *permitted* but did not *require* the jury to consider evidence of flight in determining guilt. Because the inference referred to in the flight or concealment instruction is not mandatory, Foster's argument that it unconstitutionally relieved the State of its burden of proof is unavailing.

**¶64** In any event, to the extent the flight or concealment instruction was erroneously given, such error was harmless. At trial, Foster never disputed that he left the scene knowing that an accident had occurred. Foster's awareness that his departure from the scene was wrongful can be inferred from his admission that he felt "very nervous" upon seeing the plainclothes detectives during the traffic stop because he "had a feeling of why they were contacting [him]." Thus, even assuming the flight or concealment instruction was inapplicable, it could not have affected the verdict. *See Dann*, 205 Ariz. at 565, ¶ 18 (reviewing jury instructions for harmless error). Accordingly, we will not disturb the jury's verdict on this ground.

## II.    Evidentiary Rulings

**¶65** The standard of review for the admission or exclusion of evidence is abuse of discretion. *State v. Robinson*, 165 Ariz. 51, 56 (1990). Because Foster preserved all of the arguments addressed below by raising them before and during trial, our review turns on whether any error occurred and, if so, whether it was harmless. *See State v. Reaves*, 252 Ariz. 553, 569, ¶ 49 (App. 2022).

### A.    Detective Strohmeyer's Testimony

**¶66** After defense counsel cross-examined him, the prosecutor asked Detective Strohmeyer if he believed the collision would have occurred if Foster and Carrasco had not been racing. After the court overruled Foster's objection, the detective expressed his opinion that "the crash wouldn't have happened if they were not racing." Foster challenges

the admission of this testimony on numerous bases, contending that the detective's "testimony on causation" was not properly disclosed before trial, was "beyond the scope of direct examination," and "was inadmissible as either expert or lay opinion testimony."

¶67　　　　Assuming (without deciding) that the superior court's admission of the challenged testimony was an abuse of discretion for one or more of the reasons asserted by Foster, such error was harmless. As the State correctly points out, Strohmeyer's testimony concerned whether Foster's actions were the but-for cause of the accident that killed Laura and injured Jenny. But the jury specifically found that Foster did *not* cause the accident. We do not find persuasive Foster's contention that the testimony was "extremely prejudicial" because of the purportedly close relationship between "causation" and "involvement." The fact that the jury found Foster guilty of leaving the scene of a fatal accident (which requires "involve[ment]" of the driver's vehicle in an accident, *see* A.R.S. § 28-661(A)) but *also* found that Foster did not *cause* the accident makes clear beyond a reasonable doubt that the jury recognized the difference between "involvement" and "causation." Thus, the admission of Strohmeyer's causation testimony did not contribute to the verdict, *see Dann*, 205 Ariz. at 565, ¶ 18 (so defining harmless error), and we will not disturb the jury's verdict on this ground.

## B.　　Carrasco's Driving Record and Related Evidence

¶68　　　　Foster also challenges the superior court's preclusion of evidence that Carrasco had a history of poor driving, was involved in a street racing club, and had THC in his system at the time of the collision. According to Foster, such evidence was relevant to show that Carrasco was solely responsible for the collision. He argues that the preclusion of this evidence denied him the right to present a complete defense and "severely prejudiced [him] because of the relationship between the issues of 'causation' and 'involvement' in the accident, especially in light of the prosecutor's [closing] argument explicitly conflating those two concepts."

¶69　　　　Under appropriate circumstances, a defendant may be permitted to introduce so-called "third-party culpability" evidence at trial "to show that someone else committed the crime." *State v. Machado*, 226 Ariz. 281, 282, ¶ 1 (2011). When determining whether to admit such evidence, a court must first determine its relevance, then engage in "the normal [Rule] 403 weighing analysis between relevance, on the one hand, and prejudice or confusion on the other." *State v. Prion*, 203 Ariz. 157, 161, ¶ 22 (2002). "[T]he proper focus in determining relevancy is the effect the

evidence has upon the defendant's culpability." *Id.* at 161, ¶ 24 (cleaned up). A court's ruling on the admission of third-party culpability evidence is reviewed for abuse of discretion. *Id.* at 161, ¶ 21.

**¶70** Evidence that Carrasco had a history of reckless driving and had THC in his system, even if accepted by the jury, would not exonerate Foster for leaving the scene after the collision. Because Carrasco's recklessness in causing the collision does not excuse or mitigate Foster's subsequent departure from the scene, the proffered third-party culpability evidence was irrelevant and properly rejected. *See Ex parte Hall*, 820 So. 2d 152, 157 (Ala. 2001) (holding that trial court properly precluded murder defendant's proffered third-party culpability evidence when it would not exclude defendant as "an intentional participant" in the murder); *see also State v. Grewe*, 1 CA-CR 17-0172, 2018 WL 1386170, at *2, ¶ 11 (Ariz. App. Mar. 20, 2018) (mem. decision) (noting that "whether the victim or Grewe was at fault for the accident was not relevant to determining Grewe's guilt" of charge of leaving the scene of a fatal accident because "[c]riminal culpability [under § 28-661] is not limited to those who cause vehicular accidents resulting in injury").

### C. Foster's Statements to Law Enforcement

**¶71** Finally, Foster contends that the superior court erred by denying his motion to suppress the statements he made to the detectives during the traffic stop before invoking his right to counsel. Foster argues that the statements were the product of an unlawful detention and obtained in violation of his constitutional right against self-incrimination under case law interpreting the Fourth Amendment to the United States Constitution.

### 1. Roadside Detention

**¶72** The Fourth Amendment "protects against unreasonable searches and seizures," and "[a]n investigatory traffic stop is a seizure under the Fourth Amendment." *State v. Majalca*, 251 Ariz. 325, 328, ¶ 12 (App. 2021) (citations omitted). Because it is "brief and limited in nature," however, a traffic stop does not require probable cause. *Id.* Instead, an officer conducting a traffic stop "need only possess an articulable, reasonable suspicion, based on the totality of the circumstances, that a traffic violation has occurred." *Id.* (cleaned up). The permissible duration of a traffic stop "is generally limited by the time required for an officer to address the reason that necessitated the stop." *Id.* at 328, ¶ 13.

> After the original purpose of the stop has been resolved, the officer must permit the driver to leave without further delay

or questioning unless: (1) the encounter between the officer and the driver ceases to be a detention, but becomes consensual, or (2) during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity.

*State v. Angulo-Chavez*, 247 Ariz. 255, 258, ¶ 7 (App. 2019) (cleaned up). Police officers may not "involuntarily detain individuals even momentarily without reasonable, objective grounds for doing so." *State v. Serna*, 235 Ariz. 270, 273, ¶ 12 (2014) (cleaned up).

**¶73** Foster does not deny the traffic violations that justified the initial traffic stop. *See Majalca*, 251 Ariz. at 328, ¶ 12 ("An officer who has observed a traffic violation has reasonable suspicion to initiate a traffic stop."). He argues, however, that the detectives "exceeded the permissible bounds of a traffic stop" by questioning him about the August 3 collision. He acknowledges that *Terry v. Ohio*, 392 U.S. 1 (1968) authorizes limited detentions on less than probable cause but insists that *Terry* was not intended to apply in circumstances like those presented here. In Foster's view, *Terry* authorizes "the warrantless seizure and questioning of suspects" only when officers "are in the midst of investigating suspected or recent criminal activity and must act quickly to protect themselves and confirm or dispel their suspicions." Here, he maintains, law enforcement officers conducted an "obviously pretextual traffic stop" and then subjected him to "a coercive roadside interrogation" under the guise of a *Terry* stop. "This Court," Foster concludes, "should not sanction the state's use of these ruses, pretexts, and attempts to stretch legal doctrines well beyond their underlying rationales."

**¶74** Foster's arguments are unavailing. The fact that the detectives wanted to speak with him about the August 3 collision has no bearing on the validity of the August 15 traffic stop, which was objectively justified by traffic violations that Foster does not deny. An officer's subjective motives for initiating a traffic stop are irrelevant. *See Whren v. United States*, 517 U.S. 806, 811-13 (1996). Further, the detectives did not violate his rights when they prolonged the stop beyond the initial traffic stop because they reasonably suspected he committed a felony on August 3. *See Majalca*, 251 Ariz. at 329, ¶ 14 (App. 2021) (noting that officer may properly prolong traffic stop if officer "develops a reasonable and articulable suspicion that criminal activity is afoot") (citation omitted). Foster's suggestion that a *Terry* stop is permissible only to investigate current or ongoing criminal activity is contrary to the United States Supreme Court's holding that "if police have a reasonable suspicion, grounded in specific and articulable

facts, that a person they encounter was involved in or is wanted in connection *with a completed felony*, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985) (emphasis added).

¶75        In *State v. Winegar*, the defendant argued that her murder conviction resulted from a confession obtained as a result of an invalid arrest, 147 Ariz. 440, 442 (1985). Our supreme court held that the officers did not effectuate an illegal arrest when they detained the defendant and her boyfriend on a public street and conducted a pat-down search before questioning them about a murder that had occurred several weeks earlier. *Id*. at 445-47. Because the officers had reasonable suspicion that the defendant was involved in the murder, the *Winegar* court held, the officers were justified under *Hensley* in making a limited *Terry* stop to investigate that suspicion. *Id*. at 446.

¶76        Here, the detectives had reasonable suspicion, grounded in specific and articulable facts, that Foster was involved in a completed felony on August 3. Several witnesses told investigating officers that the BMW had been "racing" a blue Lamborghini with a first responder license plate which left the scene after the BMW struck another vehicle, killing its driver. The witnesses' description of the Lamborghini was supported by video footage from a nearby "photo radar site." A record search revealed only a few cars matching this description, one of which was registered to a business owned by Foster. A Lamborghini dealership in Scottsdale confirmed that Foster purchased the vehicle. This information gave rise to a reasonable suspicion, grounded in specific and articulable facts, that Foster was involved in a completed felony, and was therefore sufficient to justify a brief and limited investigatory detention. *Winegar*, 147 Ariz. at 446; *see also State v. Dixon*, 153 Ariz. 151, 152-53 (1987) (holding that a police officer conducted "a reasonable investigatory stop" when, upon seeing a hitchhiker who fit the description of the suspect in a recent sexual assault, the officer stopped and talked to him before arresting him).

¶77        In *Winegar*, the court held that after the initially valid *Terry* stop, the officers impermissibly expanded the detention into a de facto arrest when they required the defendant to accompany them across the street to a municipal building for further questioning. 147 Ariz. at 446. "After briefly searching and questioning the defendant on the street," the *Winegar* court held, "the police either should have arrested her if probable cause had arisen, or, since none did, should have released her." *Id*. at 447. By expanding the scope of the detention, the court concluded, "the *Terry*

stop was abrogated" and the defendant's resulting confession should have been suppressed as "the result of [an] illegal arrest." *Id.* at 447, 449.

**¶78**        The detectives here, by contrast, did not unlawfully expand the scope of the initial *Terry* detention. On the contrary, one detective spoke with Foster at the scene for less than five minutes and asked only a few questions, all of which related to the August 3 collision. *See also id.* at 447 (stating that a stop's duration and whether the stop continued beyond "the purposes of limited inquiry" are essential "in determining whether the initially lawful intrusion takes on the characteristics of an unlawful detention") (citation omitted). Unlike the defendant in *Winegar*, Foster was not directed to move from one location to another pending further questioning. Until he was placed under arrest, Foster was neither searched nor physically restrained. Thus, the scope of the limited detention of Foster did not exceed that permitted in a *Terry* stop.

**¶79**        Foster maintains that policy reasons compel this Court not to "sanction" law enforcement's use of a pretextual traffic stop to investigate a completed felony. This argument is not supported by the law as stated by the Arizona Supreme Court, which we are bound to apply. *See, e.g.*, *Jones v. Sterling*, 210 Ariz. 308, 311, ¶ 11 (2005) ("[E]vidence seized as a result of a traffic stop meeting normal Fourth Amendment standards is not rendered inadmissible because of the subjective motivations of the police who made the stop.") (cleaned up); *Winegar*, 147 Ariz. at 446 ("[P]olice officers [can] perform *Terry* stops on persons suspected of *past* crimes.") (emphasis in original). Accordingly, we will not disturb the jury's verdict on this ground.

### 2.        *Miranda* **Warnings**

**¶80**        Noting that *Miranda v. Arizona*, 384 U.S. 436 (1966), requires the police to warn in-custody suspects of their rights to remain silent and to counsel before initiating questioning, Foster argues that "the officers were required to advise him of his *Miranda* rights" prior to questioning during the traffic stop and failed to do so. That failure, he contends, requires the suppression of his statements at the scene. *See State v. Aldana*, 252 Ariz. 69, 72, ¶ 11 (App. 2021).

**¶81**        It is undisputed that Foster was not advised of his *Miranda* rights prior to his arrest. Accordingly, the issue is whether he was "in custody" during that portion of the roadside detention.

**¶82**        A person is considered in custody for *Miranda* purposes if the person's "freedom of action was significantly curtailed and, if so, [when] the environment in which [the person] was questioned presented

inherently coercive pressures similar to a station house interrogation." *State v. Maciel*, 240 Ariz. 46, 50, ¶ 13 (2016). A motorist detained in a traffic stop is not generally considered to be "in custody" for *Miranda* purposes but may become so if "subjected to treatment that renders him 'in custody' for practical purposes." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

¶83 Here, the parties agree that Foster's freedom of movement at the roadside was significantly curtailed. The issue, then, is whether the environment at the scene presented "inherently coercive pressures similar to a station house interrogation." *Maciel*, 240 Ariz. at 50, ¶ 13; *see also Howes v. Fields*, 565 U.S. 499, 509 (2012) (noting that "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*," and courts must instead ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*"). "Inherently coercive pressures" will be found if the questioning takes place in an environment that "threaten[s] to subjugate the [person] to the examiner's will." *Maciel*, 240 Ariz. at 50, ¶ 16. "Various objective factors can create an inherently coercive environment," including the site and duration of the questioning, the number of law enforcement officers present, *see id.* at 50-52, ¶¶ 16-19, 26, and "the presence or absence of physical restraints during the questioning," *Howes*, 565 U.S. at 509.

¶84 The environment in which Foster was questioned did not present "inherently coercive pressures similar to a station house interrogation." *See Maciel*, 240 Ariz. at 50, ¶ 13. The pre-arrest questioning lasted less than ten minutes and occurred in full view of the public along the side of a well-traveled road. *See Berkemer*, 468 U.S. at 438-39 (noting that "the typical traffic stop is public, at least to some degree," and "is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda*"). Foster was neither handcuffed nor placed in the back of a police vehicle when questioned. He was not transported to a different location. *See Howes*, 565 U.S. at 511 (holding that *Miranda* custody may arise where a person is "abruptly transported from the street into a police-dominated atmosphere"). During the evidentiary hearing, Detective Johnson explained that he had Foster exit his vehicle for questioning because he "felt it would be safer" to avoid "standing there partially . . . in the road," given that it was a "pretty narrow road." Only three law enforcement officers, the motorcycle officer and the two detectives, were present. *See Berkemer*, 468 U.S. at 438-40 (holding that traffic stops are generally not "custody" for *Miranda* purposes in part because of the limited police presence; "[T]he detained motorist typically is confronted by only one or at most two policemen."). Although armed, none of the officers had

a weapon drawn. A detective asked Foster "only a few questions, all within the scope of the investigation," and "did not threaten force, make exaggerated displays of authority, or otherwise employ coercive tactics." *See Maciel*, 240 Ariz. at 52, ¶¶ 26-27. Because the circumstances of Foster's roadside questioning simply did not present the "inherently coercive pressures" indicative of custody for *Miranda* purposes, the superior court did not err by denying Foster's motion to suppress statements made during his roadside questioning.

¶85        Finally, Foster argues that the detective violated his constitutional right to remain silent by continuing to question him after he stated, "I really shouldn't say anything." Specifically, the detective responded by telling Foster that "some witnesses" had seen Foster's Lamborghini in the area of the collision, at which point Foster replied, "I really don't want to say anything. I saw a kid driving crazy." According to Foster, by making these two statements, he invoked his right to remain silent, and thus the detective "was forbidden by law from engaging in any further interrogation except to clarify what [Foster] meant."

¶86        Foster's argument is unavailing because it relies on the incorrect premise that he was in custody for purposes of *Miranda* when he made the statements at issue. *See State v. Carter*, 145 Ariz. 101, 107 (1985) ("If a person is *subjected to custodial interrogation* and indicates a desire that interrogation cease or otherwise invokes his right to remain silent, this decision must be scrupulously honored by the police.") (emphasis added). Assuming *arguendo* that Foster's statements "indicate[d] a desire that interrogation cease," *Carter*, 145 Ariz. at 107, that invocation was ineffective because, for the reasons discussed in ¶¶ 82-84 *supra*, Foster was not in custody at the time. *See State v. Payne*, 233 Ariz. 484, 501, ¶¶ 38-39 (2013) (holding that defendant's "initial invocation" of his *Miranda* rights "was ineffective" because he "was not in custody," in part because "the police had not indicated that he was suspected of committing a crime, had not told him he was under arrest, and had not drawn their guns"; "[A] non-custodial, anticipatory invocation of [*Miranda*] rights is not effective."). Foster is not entitled to relief on this ground.

**CONCLUSION**

¶87        For the foregoing reasons, we affirm.

**C A T T A N I**, Judge, dissenting:

¶88        I agree with the Majority that this case was marred by instructional error.  In my view, however, the error extended beyond the knowledge instruction to the involvement and flight instructions, and the error was not harmless.

¶89        The jurors were not told that knowledge of involvement in an accident is an essential element of the criminal offense of leaving the scene of an accident.  And they were incorrectly instructed that a participant in drag racing—without regard to whether the participant had stopped racing at some point before the accident—was "involved" "by any measure" in the collision and thus required to remain at the scene.  This was error.

¶90        Of course, such instructional error may be harmless if, beyond a reasonable doubt, "the error did not contribute to or affect the verdict." *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 18 (2005).  But here, the error was not harmless precisely because there was evidence from which a reasonable juror could conclude that Foster was not aware he had been involved in the accident.  Foster's car did not strike another vehicle.  And in contrast to the driver of the BMW that was moving at more than 100 MPH through the intersection and into the impact, Foster slowed down before arriving at the crash site and in fact made a safe turn at the intersection to avoid the crashed vehicles.  The jury acquitted Foster of aggravated assault and homicide charges (including all lesser-included offenses) related to the Toyota driver's death and the BMW passenger's injuries.  Moreover, the jury specifically found the State had not proved that Foster caused the accident.  Given these circumstances, a properly instructed jury could have concluded that the State did not prove that Foster knew or should have known that he had been involved in an accident and was thus required to remain at the scene.  Accordingly, I would set aside his conviction.

¶91        The Majority posits that the "Involvement in Collision" instruction given "accurately reflects Arizona law as set forth in *Korovkin*." *See supra* ¶ 32.  But the issue in *Korovkin* was simply whether one could be involved in an accident without physically colliding with another vehicle. 202 Ariz. at 497, ¶ 13.  And the *Korovkin* court did indeed offer a definition of involvement (one that did not require physical contact):

> According to Webster's Third New International Dictionary 1191 (1971), "involve" means "entangle, [or] implicate" and "to draw in as a participant."

202 Ariz. at 497, ¶ 15 (alteration in original). The *Korovkin* court also noted other jurisdictions that had addressed the issue and included a definition from a Washington appellate court:

> "Involved" is an imprecise term incorporating such concepts as being part of, contributing to and being a participant.

*Id.* at ¶ 16.

¶92 Ironically, the instruction given in this case did not track the express definitional language adopted in *Korovkin* and instead mirrored the *legal conclusion* the *Korovkin* court reached when applying the definition to the facts of that case.[4] The instruction read:

> A driver who races another driver who collides with a third car, may be found to have actively participated in the immediate chain of events culminating in the collision and, *by any measure*, have been a participant and implicated and entangled in the accident for purposes of leaving the scene of an accident including injury or death without regard (or condition upon) actual physical contact with the struck vehicle.

(Emphasis added.) To be sure, this instruction includes some of the concepts from the actual definition (e.g., participate, implicate, entangle), but it goes too far. This instruction is flawed because nothing in A.R.S. § 28-661 suggests that anyone who has participated "by any measure" in car racing is necessarily "involved" in every collision between a racer and another vehicle.

¶93 The Legislature did not craft an absolute requirement that anyone involved in any way in drag racing must remain at the scene of an accident. And this court likewise should not impose any such requirement, particularly without considering whether a driver withdrew from racing at

---

4 The *Korovkin* court's conclusion on which the instruction was based reads in full:

> We have no trouble concluding that a driver who races another driver who collides with a third vehicle actively participates in the immediate chain of events culminating in the collision and, by any measure, has been a participant and is implicated and entangled in the accident, notwithstanding any absence of actual physical contact with the struck vehicle.

202 Ariz. at 497, ¶ 15.

some point before a collision occurred. Foster's requested "Withdrawal from Racing" instruction, *see supra* ¶ 52, was, perhaps, flawed insofar as it incorrectly suggested that withdrawal at any point "prior to the time the other kills or injures a third party" necessarily precludes a finding of involvement. But the *concept* of withdrawing from racing is relevant to whether a defendant remained entangled, implicated, or a participant in the collision. *See Korovkin*, 202 Ariz. at 497, ¶ 15. At a minimum, a jury should be tasked with deciding whether the defendant withdrew soon enough (or was otherwise distant enough) not to be involved in the collision. And here, Foster's testimony that he had stopped racing well before the accident squarely raised the issue—an issue that the jury was essentially precluded from considering because of the instruction stating that participation in racing "by any measure" equated with entanglement in the accident.

¶94         This confusion as to whether Foster was *factually* involved in the accident was further complicated, as the Majority agrees, by the superior court's failure to instruct the jury that *knowledge* of involvement in an accident is an essential element of the offense. *See supra* ¶¶ 40–44. And these flaws were amplified yet again by the court's decision to give a flight instruction (at least by doing so without expressly limiting it to the relevant charges). *See supra* ¶¶ 55–57. The jurors were instructed:

> In determining whether the State has proved the defendant guilty beyond a reasonable doubt, you may consider any evidence of the defendant's running away, hiding, or concealing evidence, together with all the other evidence in the case. Running away, hiding, or concealing evidence after a crime has been committed does not by itself prove guilt.

A flight instruction—as applied to the crime of leaving the scene of an accident—is nonsensical. "Running away" is arguably a pejorative synonym for "leaving," so telling the jurors that the fact that someone "ran away" from the scene of the accident is evidence of guilt of "leaving the scene" of an accident is an improper comment on the evidence. *See* Ariz. Const. art. VI, § 27; *Rodriguez*, 192 Ariz. at 63, ¶ 29.

¶95         The Majority agrees that Foster was entitled to a different instruction on knowledge—one that required the State to prove Foster knew or should have known he had been involved in the accident. *See supra* ¶¶ 40–44. The Majority posits, however, that the error was harmless because "the facts establishing the missing element are undisputed." *See supra* ¶¶ 45–46. The Majority asserts that Foster "never disputed his knowledge of the facts giving rise to his criminal liability" because he was

aware that he "engage[d] in a contest of speed with another vehicle." *See supra* ¶¶ 49–50; *see also supra* ¶ 46 (facts bearing on racing). But the Majority's position presupposes that knowledge of participation in drag racing necessarily results in knowledge of involvement in a collision if one of the racers collides with another vehicle. That position ignores the factors detailed above, most notably the question of whether a racer whose car did not collide with another vehicle has withdrawn from racing, a fact that was hotly disputed in this case.

¶96      Given the disputed issue of whether Foster had withdrawn from racing before the accident, and in light of this combination of instructional errors and omissions that did not clarify and in fact confused the issue of involvement and knowledge thereof, I would reverse Foster's conviction.

¶97      Finally, although not critical to the resolution of this case, I note my disagreement with *Korovkin* to the extent it can be interpreted as suggesting that a defendant who was not physically involved in the collision can be guilty of leaving the scene of the accident without having *caused* the accident.

¶98      The *Korovkin* court noted that "[t]he primary purpose of A.R.S. § 28-661 is to 'prohibit drivers from seeking to evade civil or criminal liability by escaping before their identity can be established.'" 202 Ariz. at 498, ¶ 18 (quoting *State v. Powers*, 200 Ariz. 363, 364, ¶ 9 (2001)). On the criminal side, the *Korovkin* court concluded that the defendant driver in that case was sufficiently involved to be *potentially* criminally liable for the victim's death, either as an accomplice or as a principal, even though he was in fact found not guilty of second-degree murder, negligent homicide, or manslaughter. *Id.* at ¶ 20. As to the potential for civil liability, the *Korovkin* court found "instructive" the following example from the Restatement (Second) of Torts:

> A and B are driving automobiles on the public highway. A attempts to pass B. B speeds up his car to prevent A from passing. A continues in his attempt and the result is a race for a mile down the highway, with the two cars abreast and both traveling a dangerous speed. At the end of the mile, A's car collides with a car driven by C and C suffers harm. Both A and B are subject to liability to C.

*Id.* at ¶ 19 (quoting Restatement (Second) of Torts § 876 cmt. a, illus. 2 (1979)). I agree that the driver of a car racing side by side with another car

that strikes a third vehicle (as in the Restatement's example) can be found to have been involved in the accident. In that situation, jurors could reasonably conclude that both drivers participating in the racing "caused" the accident, and under that scenario, I would hold that the driver of each racing vehicle must remain at the scene of the accident.

**¶99** *Korovkin* does not mention, however, whether the jury was asked to decide whether the defendant "caused" the accident. *See generally id.* at 495–99, ¶¶ 4, 11–21. *Korovkin* thus does not address whether a person can be found liable for leaving the scene if they did not cause the accident.

**¶100** In my view, the answer to that question is no. If a defendant is acquitted of criminal charges stemming from, e.g., the injuries and death resulting from the accident, *and* the jury further concludes that the defendant's conduct did not cause the accident, I would hold that there is no criminal liability under A.R.S. § 28-661. "Involvement" in a collision obviously includes the drivers of cars that collide, regardless of fault. But for drivers of other cars that have not collided, from my perspective, the only rational conclusion regarding "involvement" is that other drivers are not involved unless they in some way causally contributed to the accident. In fact, to conclude otherwise would render the statute unconstitutionally vague. *See Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983) (holding that the Government violates the Due Process Clause when it takes away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes).

**¶101** The Legislature is free to craft additional responsibilities and impose additional consequences for anyone who engages in drag racing. But unless the Legislature does so, I would interpret A.R.S. § 28-661 as requiring only that anyone whose vehicle collides with another vehicle and anyone who caused the collision must remain at the scene of the accident.

