IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

_____

THE STATE OF ARIZONA,
*Appellee*,

*v.*

JESUS ISMAEL RODRIGUEZ,
*Appellant*.

No. 2 CA-CR 2023-0205
Filed May 13, 2025

_____

Appeal from the Superior Court in Pima County
No. CR20210489001
The Honorable Brenden J. Griffin, Judge

**AFFIRMED**

_____

COUNSEL

Kristin K. Mayes, Arizona Attorney General
Alice M. Jones, Deputy Solicitor General/Section Chief of Criminal Appeals
By Tanja K. Kelly, Assistant Attorney General, Tucson
*Counsel for Appellee*

Hernandez & Hamilton PC, Tucson
By Carol Lamoureux and Joshua F. Hamilton
*Counsel for Appellant*

**OPINION**

Judge Vásquez authored the opinion of the Court, in which Judge Sklar concurred and Presiding Judge Eckerstrom concurred in part and dissented in part.

V Á S Q U E Z, Judge:

¶1         Jesus Rodriguez appeals his convictions and sentences for first-degree felony murder, aggravated assault with a deadly weapon, criminal damage, unlawful flight from a pursuing law enforcement vehicle, and two counts of driving under the influence of an intoxicant (DUI).  On appeal, Rodriguez argues the trial court erred by (1) improperly giving a flight instruction to the jury; (2) giving a jury instruction that incorrectly stated the law on an essential element of the unlawful flight offense; (3) denying his motion for a judgment of acquittal on the felony murder, unlawful flight, and criminal damage charges; and (4) admitting his involuntary statement at trial over his objection.  Rodriguez also contends his life sentence for the felony murder conviction is cruel and unusual, in violation of the United States and Arizona Constitutions.  For the following reasons, we affirm.

**Factual and Procedural Background**

¶2         We view the facts in the light most favorable to sustaining the jury's verdicts and resolve all reasonable inferences against Rodriguez. *See State v. Fierro*, 254 Ariz. 35, ¶ 2 (2022).  Just after midnight on February 21, 2021, a Pima County Sheriff's Deputy was on patrol driving in a marked police vehicle when he saw Rodriguez speeding in the opposite direction. The deputy made a U-turn at the next intersection and "had to accelerate significantly to catch up."  Rodriguez stopped at the next two red lights, but each time the light turned green, he "continued on at a high rate of speed again," and the deputy could not "catch up."  The deputy confirmed that at this point he did not "have [his] red and blue lights and siren on" because he was not close enough to make a traffic stop.  However, the deputy radioed for a police airplane that he knew was overhead to assist with surveillance.

¶3         A few moments later, Rodriguez turned into an apartment complex, and the deputy followed.  As Rodriguez drove into the complex,

he slowed to thirty-five to forty miles per hour, which enabled the deputy to close the distance. When the deputy was "a vehicle distance behind [Rodriguez]," he "turned on [his] red and blue lights" to make sure Rodriguez "knew [he] was trying to stop him." Rodriguez then significantly slowed to "approximately five to ten miles per hour," but did not pull over. The deputy next employed "a couple siren bursts," but when Rodriguez still did not pull over, the deputy "activate[d his] sirens continuously." Rodriguez then merged closer to the curb lane and eventually came to a stop. The deputy stopped his vehicle, stepped out, and "yell[ed] to [Rodriguez] to turn off the car."[1]

¶4        Rodriguez drove away and made a high-speed, right-hand turn onto the adjacent street. For safety reasons, the deputy transitioned from "active pursuit" to "active surveillance" and watched from a distance as Rodriguez continued speeding toward the next intersection. Rodriguez ran the red light and collided with a Chevrolet Malibu that had entered the intersection across Rodriguez's path. The collision killed the Malibu's driver, R.C., and seriously injured the passenger, M.C. The deputy reactivated his emergency lights when he arrived at the intersection and "placed [Rodriguez] in handcuffs."

¶5        Rodriguez was transported to the hospital for his injuries from the accident. While there, a DUI investigation officer conducted two sobriety tests that indicated Rodriguez was impaired. The officer arrested Rodriguez for DUI and obtained a search warrant to collect samples of his blood. During the second blood draw, Rodriguez told the officer "I'm drunk, I ran away from you guys and crashed into that car and I hurt somebody—I killed somebody." Rodriguez's blood alcohol concentration (BAC) was determined to have been .187 about ninety minutes after the accident.

¶6        After a three-day jury trial, Rodriguez was convicted as described above, and the trial court sentenced him to concurrent and consecutive sentences, the longest of which is life in prison with the possibility of release after twenty-five years, followed by a 7.5-year prison term, and time served for his misdemeanor counts. This appeal followed.

---

[1]When a police vehicle is put into park, the emergency lights remain on but the siren automatically deactivates so the officer can speak without having to "yell over a siren."

We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

**Discussion**

**I.   Admission of Involuntary Statement**

¶7        Rodriguez argues the trial court erred by admitting evidence of his involuntary statements to police over his objection at trial.  We review issues of statutory interpretation and constitutional law de novo.  *State v. Wein*, 242 Ariz. 372, ¶ 7 (App. 2017).  Because Rodriguez objected to the introduction of his statements on voluntariness grounds below, our review is for harmless error.[2]  *State v. Soliz*, 223 Ariz. 116, ¶ 10 (2009).

¶8        During the DUI officer's testimony at trial, the state moved to admit a video clip of the officer's body worn camera with footage taken at the hospital during Rodriguez's second blood draw.  Rodriguez objected, arguing at the subsequent bench conference that the "essence of the clip" was Rodriguez's statement "I'm drunk, I ran from you guys, I killed somebody."  He asserted that he had "questions about the voluntariness" of the statement and believed it was "incomplete or taken out of context." The state countered that it was "something that [Rodriguez] volunteer[ed] without being asked a question at all," and given that a "prerequisite for voluntariness is some sort of state action," they were "past the voluntariness inquiry."  As to the "completeness theory," the state said it was focusing on a "relatively short" clip of the full video to avoid the "portions of the footage where . . . [Rodriguez was] reacting kind of violently" and saying "stuff the jury shouldn't hear."  The state also noted

_____

[2]The state contends Rodriguez "concede[d]" that his failure to "move to suppress his confession or request a voluntariness hearing below" means his claims should be "reviewed only for fundamental, prejudicial error."  *See State v. Henderson*, 210 Ariz. 561, ¶ 19 (2005).  This misinterprets Rodriguez's argument.  Citing to *State v. Tison*, 129 Ariz. 526, 535 (1981), Rodriguez admits that his failure to raise the issue of voluntariness prior to trial means "he has waived his ability [on appeal] to challenge the absence of *Miranda* warnings," but he otherwise argues the issue was "adequately preserved" for appellate review because he both "objected to the introduction [of] his statement at trial" and "presented evidence and argument that his confession was involuntary."  *See State v. Bush*, 244 Ariz. 575, ¶ 54 (2018).  Rodriguez did not waive his voluntariness argument on appeal.

that if Rodriguez wanted to play additional footage from the video, he was entitled to do so.

**¶9** The trial court overruled Rodriguez's objection, adding "if there was any sort of voluntariness type objection for the [c]ourt to decide, that need[ed] to come well-before trial." The court also noted that Rodriguez's other concerns went "to the weight of the evidence," and as to the "contextual argument, [Rodriguez could] put it in whatever context he want[ed] when he present[ed] his case." The video clip was then admitted and played for the jury.[3]

## A. Voluntariness Inquiry

**¶10** "To be admissible, a statement must be voluntary, not obtained by coercion or improper inducement." *State v. Ellison*, 213 Ariz. 116, ¶ 30 (2006). A confession is presumed to be involuntary, and it is the state's burden to prove by a preponderance of the evidence that a defendant's statement was freely and voluntarily given. *State v. Byrd*, 160 Ariz. 282, 283 (App. 1988). However, in the absence of "both coercive police behavior and a causal relation between the coercive behavior and the defendant's overborne will," the voluntariness of a confession will not be questioned. *State v. Boggs*, 218 Ariz. 325, ¶ 44 (2008). And "[w]hen an officer testifies that the confession was obtained without promises, threats[,] or coercion," then "a prima facie case for admissibility is established." *Byrd*, 160 Ariz. at 283. We look to the totality of the

---

[3]The video clip contained the following exchange:

Rodriguez: I'm drunk.

Officer: What's that?

Rodriguez: I ran away from you guys. And I crashed into that car.

Officer: Yep.

Rodriguez: And I hurt somebody, I killed somebody.

Officer: You did.

circumstances surrounding a confession to determine whether a defendant's will has been overborne. *State v. Blakely*, 204 Ariz. 429, ¶ 27 (2003).

**¶11** On appeal, Rodriguez asserts his confession was involuntary on multiple grounds. For all but his argument related to *Miranda* warnings, we address each contention in turn.[4] First, Rodriguez argues his admission at the hospital was a "post-arrest statement that was made in direct[] response to [the DUI officer] informing him that he fled from police and killed someone," which was "reasonably likely to elicit an incriminating response under the circumstances." The record indicates otherwise.

**¶12** The DUI officer assigned to Rodriguez's case testified that "right after the first blood draw," he remembered "telling . . . Rodriguez that he had killed someone" and that "he ran from the police." Rodriguez did not make the inculpatory statements until roughly "an hour later," immediately "after the second blood draw." The officer confirmed that prior to the statements being made, he had not "ask[ed Rodriguez] a question"; rather, the officer characterized the statements as "unprompted utterances" that Rodriguez had "just blurted out." The body-worn video confirms the officer's testimony. It shows that Rodriguez initiated the exchange, which undercuts a finding of involuntariness. *See Byrd*, 160 Ariz. at 283; *cf. State v. Noleen*, 142 Ariz. 101, 108 (1984) (where defendant initiated interview from which statements were taken and admitted at trial, statements were voluntary and any attempt to challenge voluntariness of those statements "would have been futile"). Thus, we are unpersuaded by Rodriguez's argument that his statements were a "direct[] response" to any information provided by the officer or that the officer in any way "coerc[ed]" or encouraged a confession. *See Boggs*, 218 Ariz. 325, ¶ 44.

---

[4]Rodriguez additionally argues that his confession was a "post-arrest, custodial statement that was extracted after Rodriguez had requested a lawyer and without the benefit of *Miranda* warnings." However, voluntariness and *Miranda* warning violations are two distinct inquiries. *State v. Rivera*, 152 Ariz. 507, 512 (1987). And, as previously noted, by failing to move to suppress his statements prior to trial, Rodriguez has waived the ability to challenge the absence of *Miranda* warnings on review. *See Tison*, 129 Ariz. at 535. Therefore, to the extent Rodriguez raises a *Miranda*-related claim, we do not address it. *See State v. West*, 238 Ariz. 482, ¶ 49 (App. 2015) (failure to properly address or preserve argument constitutes waiver of appellate review).

¶13        Next, while Rodriguez seems to concede he was not subjected to any "express questioning" by law enforcement at the hospital, he argues that by telling him he "'ran' from a deputy and killed someone," the officer's words and actions were "reasonably likely to elicit an incriminating response" and were therefore the "functional equivalent of interrogation."  Rodriguez relies on *State v. Londo*, 215 Ariz. 72, ¶ 6 (App. 2006), and *State v. Emery*, 131 Ariz. 493, 498 (1982), to support this argument, but neither case applies.  The primary focus in both *Londo* and *Emery* was on *Miranda* rights, which are not at issue here.  *Londo*, 215 Ariz. 72, ¶¶ 6-11 (inculpatory statement admissible under "private safety exception" to *Miranda*); *Emery*, 131 Ariz. at 496-502 (clear violation of *Miranda* rights when interrogation continued after defendant requested counsel and officers engaged in "impermissible conduct" by threatening defendant with "gas chamber" and "death penalty" to induce confession).

¶14        Rodriguez next asserts his statement was involuntary because "it was uttered when [he] was extremely distraught and emotional after learning he had killed someone."  In the absence of threats, intimidation, deception, or "physical or psychological pressures exerted by the police," *State v. Tucker*, 157 Ariz. 433, 445 (1988), the fact that Rodriguez was "extremely distraught and emotional" has no bearing on the admissibility of his statements.  *See id.* at 446 (question of voluntariness must focus on police conduct, not solely defendant's mental state).  Rodriguez does not point to anything in the record to show that the officer threatened, intimidated, deceived, or exerted any "pressures" on him at any point during their hospital encounter.  *Id.* at 445.  By failing to demonstrate that his statements were "the product of coercive police tactics," Rodriguez's argument is unavailing.  *Id.*

¶15        Finally, Rodriguez asserts his statement was involuntary because he "had just been in a serious accident and had sustained injuries to his head and was in significant pain."  While potentially relevant to whether he was "susceptible to coercive police conduct," the fact that Rodriguez may have been ill or injured at the time he confessed "does not by itself render the confession involuntary."  *See Londo*, 215 Ariz. 72, ¶ 13.  Similarly, intoxication will not result in a finding of involuntariness unless the defendant was "so intoxicated that he could not understand the meaning of his statements," rendering them "so unreliable that they must be excluded."  *Tucker*, 157 Ariz. at 446.  There is nothing in the record that shows Rodriguez was unable to "reason, comprehend, or resist" when he confessed.  *See id.*  Rather, the hour delay between each of Rodriguez's interactions with the officer undermines a finding of coercion and indicates

he had time to reflect and thus to more fully understand both the gravity of his situation and the meaning of his statements. *See id.*

¶16 Again, because Rodriguez has failed to demonstrate coercive police tactics of any kind, and because the record is devoid of evidence showing that Rodriguez's "will [was] overborne," *see Blakely*, 204 Ariz. 429, ¶ 27, the trial court did not err by considering his statements voluntary and admitting them at trial over Rodriguez's objection, *see Tucker*, 157 Ariz. at 446.

## B. Right to a *Sua Sponte* Voluntariness Hearing

¶17 Rodriguez nevertheless contends he was entitled to a "sua sponte voluntariness hearing" at the time his objection was made. He argues the trial court's failure to hold such a hearing violated his due process rights. "A defendant 'objecting to the admission of a confession' has a constitutional right grounded in the Fourteenth Amendment's Due Process Clause 'to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined.'" *State v. Bush*, 244 Ariz. 575, ¶ 54 (2018) (quoting *Jackson v. Denno*, 378 U.S. 368, 380 (1964)). However, due process does not require a voluntariness hearing "absent some objection by the defendant to the admission of his confession," and typically a defendant must "object to the use of his confession prior to trial unless the opportunity to do so did not exist, or the defendant was unaware of the grounds for the motion, or the court, in its discretion, chooses to entertain the motion at trial." *State v. Alvarado*, 121 Ariz. 485, 487 (1979).

¶18 Rodriguez concedes he did not file a motion to suppress his statements or request a voluntariness hearing prior to trial, and he does not argue that his failure to do so was based on evidence that "was not then known" or that "could not have been known" if he exercised "reasonable diligence" to discover it.[5] Ariz. R. Crim. P. 16.1(c); *see Bush*, 244 Ariz. 575,

---

[5]At the bench conference following Rodriguez's objection, the state argued it had "disclosed all of the evidence in this case early and often," and it had provided Rodriguez with notice of the full hospital video "years" before trial. This necessarily includes the inculpatory statements Rodriguez made in the "isolated [twenty-five] second portion" of the video that was shown to the jury at trial. The ample opportunity Rodriguez had to timely file a motion to suppress or request a voluntariness hearing supports the

¶ 51. Nevertheless, citing to A.R.S. § 13-3988 and *Bush*, 244 Ariz. 575, ¶ 54, Rodriguez maintains he "sufficiently objected to and challenged the admissibility of his statement[s] at trial such that he triggered his constitutional right to a voluntariness hearing." We disagree.

**¶19** In *Bush*, our supreme court stated "[§] 13-3988(A) provides that, before a 'confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any *issue* as to voluntariness,'" and therefore, "consistent with *Wainwright* and *Alvarado*, a trial court must address the issue of voluntariness if a defendant raises it." 244 Ariz. 575, ¶ 62 (emphasis added in *Bush*) (citing *Wainwright v. Sykes*, 433 U.S. 72 (1977) and *Alvarado*, 121 Ariz. 485). Here, we agree that Rodriguez's objection during trial constituted a "contemporaneous challenge" to the admission of his statements. *Id.* ¶ 54 (quoting *Wainwright*, 433 U.S at 86). However, we do not interpret *Bush*'s holding to mean that Rodriguez was thus "constitutional[ly]" entitled to a *sua sponte* voluntariness hearing under the circumstances. *Id.* ¶ 62; *see Alvarado*, 121 Ariz. at 487 (right to voluntariness hearing does not necessarily extend to all stages of criminal proceedings).

**¶20** While *Bush* established that a trial court must "address the issue of voluntariness," it did not hold that a trial court must conduct a "*sua sponte* hearing." 244 Ariz. 575, ¶ 62; *see Alvarado*, 121 Ariz. at 488 (if motion is untimely or not filed, whether to "entertain a motion for a voluntariness hearing at trial" is left to exclusive discretion of trial court). Here, the court adequately addressed the voluntariness issue by holding a bench conference during which both Rodriguez and the state had an opportunity to be heard. By overruling Rodriguez's objection, the court implicitly determined that his statements were voluntary, and "absent a showing of clear and manifest error," we will not upset a court's determination of voluntariness on review. *Alvarado*, 121 Ariz. at 488.

**¶21** In sum, Rodriguez was neither constitutionally nor statutorily entitled to a *sua sponte* voluntariness hearing. The trial court adequately addressed the issue of voluntariness, and, finding none, it did not err by admitting his statements at trial. *See Bush*, 244 Ariz. 575, ¶ 62; *Alvarado*, 121 Ariz. at 488.

---

trial court's comment that "if there was any sort of voluntariness type objection for the [c]ourt to decide, that need[ed] to come well-before trial."

## II. Flight Instruction

**¶22** Rodriguez argues that because he was charged with unlawful flight and felony murder, "both of which contain elements pertaining to flight," the trial court's decision to give a flight instruction was reversible error. He maintains the instruction risked confusing the jury about which elements they were required to find in order to return a guilty verdict for each offense and "may have relieved the [s]tate of its burden of proving [the] specific elements of those offenses" beyond a reasonable doubt.[6] We review a trial court's decision to give a jury instruction for an abuse of discretion. *State v. Martinez*, 218 Ariz. 421, ¶ 49 (2008).

**¶23** Rodriguez objected to the flight instruction at trial, which would typically preserve the issue for harmless error review. *See State v. Henderson*, 210 Ariz. 561, ¶ 18 (2005). Under that standard, the state has the burden to establish "beyond a reasonable doubt that the error did not contribute to or affect the verdict." *Id.*[7] However, in *State v. Foster*, ___ Ariz. ___, ¶ 57, 559 P.3d 1139, 1153 (App. 2024), this court held that a defendant's failure to request a limiting instruction warranted denying relief on his claim that the flight instruction was improper. In that case, the flight instruction also applied to other charges and the defendant did not request an instruction limiting it to those charges and not for the leaving-the-scene charge. *Id.* In this case, the unlawful flight instruction did not apply only to the unlawful flight and felony murder charges—notably it also applied to the DUI counts. *See State v. Salazar*, 173 Ariz. 399, 409 (1992) (flight

---

[6]Rodriguez generally asserts that a flight instruction is inappropriate in any case where "a defendant is charged with a crime that involves flight or concealment as an element of the offense." However, he relies almost exclusively on out-of-state cases to support this claim. *See Graves v. Commonwealth*, 780 S.E.2d 904, 908 (Va. Ct. App. 2016); *State v. Girard*, 578 P.2d 415, 417-18 (Or. Ct. App. 1978); *State v. Fast Horse*, 490 N.W.2d 496 (S.D. 1992). We are not bound by the decisions of courts in other states, *State v. Solis*, 236 Ariz. 242, ¶ 14 (App. 2014), and because Arizona caselaw addresses this issue, we need not look to other jurisdictions for guidance.

[7]The state argues that even if the flight instruction were improper, "the error was harmless" because there was overwhelming evidence that Rodriguez had committed the crime of unlawful flight and the instruction could not have affected the jury's verdict. But because Rodriguez has forfeited all but fundamental error review, we do not address the state's harmless error argument.

instruction proper where defendant's actions reveal consciousness of guilt). Because Rodriguez did not request a limiting instruction, he has forfeited review for all but fundamental, prejudicial error. *See Foster*, ___ Ariz. ___, ¶ 57, 559 P.3d at 1153; *State v. Bolivar*, 250 Ariz. 213, ¶ 14 (App. 2020) (applying fundamental error review when party fails to propose or request limiting instruction at trial).

¶24        A flight instruction may be given if there is evidence of flight after an offense is committed "from which jurors can infer a defendant's consciousness of guilt." *State v. Solis*, 236 Ariz. 285, ¶ 7 (App. 2014). Such an instruction is appropriate if there is evidence supporting a reasonable inference that: (1) "the flight or attempted flight was open, such as the result of an immediate pursuit," or (2) "the accused utilized the element of concealment or attempted concealment." *State v. Smith*, 113 Ariz. 298, 300 (1976). Stated differently, in determining whether to give the instruction, the trial court must "be able to reasonably infer from the evidence that the defendant left the scene in a manner which obviously invites suspicion or announces guilt." *State v. Speers*, 209 Ariz. 125, ¶ 28 (App. 2004) (quoting *State v. Weible*, 142 Ariz. 113, 116 (1984)). To satisfy the "consciousness of guilt" requirement, "[i]t is not necessary to show that law enforcement officers were pursuing the defendant at the time." *State v. Wilson*, 185 Ariz. 254, 257 (App. 1995). Merely "leav[ing] the scene" of a crime is insufficient to support a flight instruction; instead, the inquiry focuses on whether the defendant "voluntarily withdrew himself 'in order to avoid arrest or detention.'" *State v. Salazar*, 112 Ariz. 355, 356-57 (1975) (quoting *State v. Rodgers*, 103 Ariz. 393, 395 (1968)).

¶25        Rodriguez argues, as he did below, the flight instruction "risked confusing the jury" because "to laypeople, flight[ and] unlawful flight . . . may sound like the same thing." He also maintains that the language in the flight instruction so closely "tracked critical evidence at trial" that it "further exacerbated the risk that the jury may have believed it could convict Rodriguez of unlawful flight and felony murder so long as it was satisfied that he had 'run[] away.'"[8] We are not persuaded by either of these arguments.

---

[8]Specifically, Rodriguez's argument is based on the flight instruction's reference to "running away" in relation to evidence that he "ran away from [law enforcement]" and the "several references" made throughout trial "to the fact that Rodriguez 'ran' a red light."

**¶26**         The trial court provided the following flight instruction, pursuant to Revised Arizona Jury Instructions (RAJI) Standard Criminal 9 (5th ed. 2019):

> In determining whether the [s]tate has proved the defendant guilty beyond a reasonable doubt, you may consider any evidence of the defendant's running away, hiding, or concealing evidence, together with all the other evidence in the case. You may also consider the defendant's reasons for running away, hiding, or concealing evidence. Running away, hiding, or concealing evidence after a crime has been committed does not, by itself, prove guilt.

And the court gave the following instruction on the unlawful flight charge:

> The crime of unlawful flight from a pursuing law enforcement officer requires proof of the following two things: One, the defendant, who was driving a motor vehicle, willfully fled from or attempted to elude a pursuing official law enforcement vehicle; and two, the law enforcement vehicle was appropriately marked showing it to be an official law enforcement vehicle.[9]

**¶27**         First, the flight instruction does not contain the same language or involve the same elements as those of unlawful flight and felony murder. *See* A.R.S. §§ 28-622.01 (unlawful flight), 13-1105(A)(2)

---

[9]The court also instructed the jury on the definition of "[k]nowingly" pursuant to A.R.S. § 13-105(10)(b):

> Knowingly means that a defendant acted with awareness of the existence of conduct or circumstances constituting an offense. It does not mean that a defendant must have known the conduct is forbidden by law. It is no defense that the defendant was not aware of the existence of conduct or circumstances solely because of voluntary intoxication.

(felony murder).[10]   We therefore do not agree that the flight instruction "risked confusing the jury with respect to the elements it needed to find" in order to determine "that Rodriguez '*wil[l]fully fled*' a pursuing officer and caused a death during the course of . . . that offense."

**¶28**        Further, the type of elusive or furtive conduct that justifies a flight instruction does not necessarily involve the "wil[l]ful[] flee[ing] or attempt[ing] to elude a pursuing official law enforcement vehicle" necessary to establish the crime of unlawful flight.   § 28-622.01; *compare* RAJI Stand. Crim. 9 (flight instruction), *with* § 28-622.01 (unlawful flight). Notably, evidence of a defendant's actual or attempted "running away" or "concealment" does not necessarily include an element of "pursuit." *Wilson*, 185 Ariz. at 257.

**¶29**        Lastly, a jury instruction is not improper simply because it includes the same language used by witnesses testifying at trial or the same words as other jury instructions given by the court.   And where the instructions accurately state the law, *see State v. Rix*, 256 Ariz. 125, ¶¶ 43-44 (App. 2023), similar language is not a reason to assume juror confusion, *cf. State v. Riley*, 248 Ariz. 154, ¶ 88 (2020) (court does not speculate that jurors were misled or confused by instructions).

**¶30**        We also disagree with Rodriguez's claim that the flight instruction may have unconstitutionally "relieved the [s]tate of its burden of proving [the] specific elements" of the offense of unlawful flight.[11]  "In assessing the constitutionality of jury instructions dealing with presumptions, 'we must first determine if the presumption is mandatory or permissive.'"  *State v. Abdi*, 226 Ariz. 361, ¶ 9 (App. 2011) (quoting *State v.*

---

[10]With regard to felony murder, the trial court instructed the jury: "The crime of first-degree felony murder requires proof that, one, the defendant committed unlawful flight from a pursuing law enforcement vehicle; and two, in the course of and in furtherance of that offense or immediate flight from that offense, the defendant caused the death of any person."

[11]Rodriguez's murder conviction was based on the jury finding him guilty of unlawful flight.  Because felony murder "requires no specific mental state other than what is required for the commission" of the felony upon which it is predicated, § 13-1105(B), we address Rodriguez's claim regarding the risk of confusion from the flight instruction only as it relates to the elements of unlawful flight.

*Lopez*, 134 Ariz. 469, 472 (App. 1982)). "A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts." *State v. Peraza*, 239 Ariz. 140, ¶ 28 (App. 2016) (quoting *Francis v. Franklin*, 471 U.S. 307, 314 (1985)). In contrast, "a permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Foster*, ___ Ariz. ___, ¶ 62, 559 P.3d at 1154, (quoting *Peraza*, 239 Ariz. 140, ¶ 29). And while "[m]andatory presumptions represent an impermissible burden shift when 'they relieve the State of the burden of persuasion on an element of an offense,'" *Peraza*, 239 Ariz. 140, ¶ 28 (quoting *Francis*, 471 U.S. at 314), "the use of a permissive presumption is constitutional if there is a rational connection between the predicate and presumed facts," *State v. Platt*, 130 Ariz. 570, 574 (App. 1981).

¶31 Here, the flight instruction provided that "[i]n determining whether the [s]tate has proved the defendant guilty beyond a reasonable doubt," the jury "*may* consider any evidence of the defendant's running away, hiding, or concealing evidence" together with the rest of the evidence in the case. RAJI Stand. Crim. 9 (emphasis added). The trial court also expressly instructed the jury that evidence of flight or concealment, without more, does not establish guilt. *Id.*; *see Foster*, ___ Ariz. ___, ¶ 63, 559 P.3d at 1154. As noted above, the flight instruction applied to the DUI counts and provided context for Rodriguez's conduct. The instruction "*permitted* but did not *require*," *Foster*, ___ Ariz. ___, ¶ 63, 559 P.3d at 1154, the jury to consider Rodriguez's failure to stop as evidence that he had a "consciousness of guilt" for driving under the influence, *Solis*, 236 Ariz. 285, ¶ 7. Specifically, it allowed the jury to determine whether, by continuing to drive away from the deputy, Rodriguez was attempting to "voluntarily withdr[a]w himself 'in order to avoid arrest or detention'" for the DUI offenses. *Salazar*, 112 Ariz. at 357 (quoting *Rodgers*, 103 Ariz. at 395). Despite Rodriguez's argument to the contrary, the instruction served that purpose even though he acknowledged while testifying that he had committed DUI. The jury was still required to reach a verdict on the DUI charge, and the instruction assisted it in doing so.

¶32 In addition, Rodriguez argues that a flight instruction on DUI was improper because DUI is a strict-liability offense. Because a flight instruction is relevant only to consciousness of guilt, he reasons, it has no relevance to crimes that lack a mental-state element. Whatever the merits of this argument, we deem it waived because Rodriguez raised it for the first time in his reply brief. *See State v. Brown*, 233 Ariz. 153, ¶ 28 (App.

2013). Applying waiver is especially appropriate in light of the limited scope of our fundamental error review.

**¶33**       Nevertheless, because Rodriguez's actions invited "some suspicion of guilt," the trial court did not abuse its discretion by giving the flight instruction. *State v. Parker*, 231 Ariz. 391, ¶ 48 (2013) (quoting *State v. Thornton*, 187 Ariz. 325, 334 (1996)). There was no error, fundamental or otherwise. *See State v. Murray*, 250 Ariz. 543, ¶ 14 (2021) (first step of fundamental error review is "determining whether trial error exists." (quoting *State v. Escalante*, 245 Ariz. 135, ¶ 21 (2018))).

## III. Unlawful Flight Instruction

**¶34**       Rodriguez argues the trial court committed fundamental error by misstating the law in its unlawful flight instruction. He contends the instruction did not include a requirement that the officer use his siren "as reasonably necessary." We review de novo whether a jury instruction correctly states the law and consider the instructions as a whole to determine whether the jury received the information necessary to reach a legally correct decision. *State v. Ewer*, 254 Ariz. 326, ¶ 10 (2023). Because Rodriguez failed to object to the unlawful flight instruction below, he has forfeited review all but for fundamental, prejudicial error. *See Henderson*, 210 Ariz. 561, ¶ 19.

**¶35**       Arizona's unlawful flight statute, § 28-622.01, provides in relevant part:

> A driver of a motor vehicle who wil[l]fully flees or attempts to elude a pursuing official law enforcement vehicle is guilty of a class 5 felony if the law enforcement vehicle is . . . 1. Being operated in the manner described in [A.R.S.] § 28-624, subsection C and is appropriately marked to show that it is an official law enforcement vehicle.

**¶36**       As we articulated in *State v. Martinez*, 230 Ariz. 382, ¶ 8 (App. 2012), "the essential elements of the crime of unlawful flight are: (1) the defendant, who was driving a motor vehicle, willfully fled or attempted to elude a pursuing law enforcement vehicle, and (2) the law enforcement vehicle was appropriately marked showing it to be an official law enforcement vehicle." We have also determined that the plain language of "§ 28-624(C), to which § 28-622.01 refers, requires the driver of an

authorized emergency vehicle to use a siren or other audible signal only 'as reasonably necessary.'" *In re Joel*, 200 Ariz. 512, ¶ 5 (App. 2001); *see Simkins v. Pulley*, 116 Ariz. 487, 491 (App. 1997) ("[T]he language of [§ 28-624(C)] sets forth the parameters of the duty 'as may be reasonably necessary.'").

**¶37**          Relying on *In re Joel*, Rodriguez argues the proper interpretation of § 28-624(C) mandates the use of sirens "as reasonably necessary" as an essential element of the offense of unlawful flight. And while he concedes "the *Martinez* court correctly determined that 'activation of emergency lights is not an essential element' of unlawful flight," he insists *Martinez* relied on a "misinterpretation of *In re Joel*" when it "erroneously concluded that the use of sirens is also not an element of the offense." He further contends "the *Martinez* court ignored § 28-622.01's reference to [§] 28-624(C) and rendered the entire provision of the statute meaningless." We disagree. In *Martinez*, we expressly "d[id] not reach the issue of whether unlawful flight requires proof that an officer used sirens 'as reasonably necessary'" because the issue "was not presented to the trial court and ha[d] not been addressed by the parties on appeal." 230 Ariz. 382, n.3. In that case, we addressed only the use of emergency lights.[12] *See id.*

**¶38**          Rodriguez also misinterprets *In re Joel*. Contrary to his argument, we did not hold that the use of a siren is an essential element of the offense of unlawful flight. Rather, we concluded "[i]t is clear from the plain language of § 28-624(C) that drivers of authorized emergency vehicles—and, by extension, law enforcement officers under § 28-622.01— must *only* use a siren or other audible warning 'as reasonably necessary.'" 200 Ariz. 512, ¶ 7 (emphasis added). And because the pursuing deputy in *In re Joel* testified that it was unnecessary to activate his siren under the circumstances, we concluded the state had "established the requisite

---

[12]Relying on *In re Joel*, we stated that "[w]hile operating emergency lights may provide circumstantial evidence that a defendant was 'willfully' fleeing from an official law enforcement vehicle, activation of emergency lights is not an essential element of the crime of unlawful flight." *Martinez*, 230 Ariz. 382, ¶ 7. We then clarified that § 28-622.01 does not require proof that a pursuing law enforcement vehicle was being operated with emergency lights. *Id.* We noted that any statement to the contrary in *State v. Nelson*, 146 Ariz. 246, 249 (App. 1985) is "dicta, and overlooks 'the exception in § 28-624(C) for police vehicles vis-a-vis the emergency lights requirement.'" *Martinez*, 230 Ariz. 382, ¶ 7 (quoting *State v. Fiihr*, 221 Ariz. 135, n.2 (App. 2008)); *see also In re Joel*, 200 Ariz. 512, ¶ 5.

elements of the offense under §§ 28-622.01 and 28-624(C)" based only on the deputy's activation of his emergency lights. *Id.* ¶ 8.

**¶39** In any event, we need not resolve whether the use of a siren "only 'as reasonably necessary,'" *In re Joel*, 200 Ariz. 512, ¶ 5, amounts to an element of the offense. Our review for fundamental error also requires Rodriguez to demonstrate prejudice. *See Escalante*, 245 Ariz. 135, ¶¶ 18, 21. To prove prejudice, Rodriguez must show that a reasonable, properly instructed jury "could have reached a different result." *State v. James*, 231 Ariz. 490, ¶ 15 (App. 2013). Here, the state established that the deputy activated his siren—first in a series of "bursts" and then "continuously"— to the extent he deemed reasonably necessary under the circumstances. *See In re Joel*, 200 Ariz. 512, ¶ 7. On the record presented, Rodriguez has failed to show resulting prejudice.

## IV. Denial of Motion Under Rule 20, Ariz. R. Crim. P.

**¶40** Rodriguez argues the trial court erred in denying his motion for a judgment of acquittal as to the felony murder, unlawful flight, and criminal damage charges.[13] We review a court's ruling on a Rule 20 motion de novo. *State v. West*, 226 Ariz. 559, ¶ 15 (2011). We will not reverse unless there is "a complete absence of probative facts to support a conviction." *State v. Mathers*, 165 Ariz. 64, 66 (1990). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

---

[13]In his opening brief, Rodriguez claims he "moved for judgment of acquittal on all counts" at trial. But when arguing the motion to the trial court, Rodriguez focused on the unlawful flight, the first-degree felony murder, and the criminal damage charges, contending there was insufficient evidence for those counts to go to the jury. Rodriguez noted "generally regarding . . . the DUIs and the aggravated assault," that the state had not "met its burden there either," but he did not provide any meaningful argument on those charges. Most importantly, Rodriguez concedes in his opening brief that "[a]t trial, [he] admitted he drove under the influence, caused a fatal collision, and was thus responsible for causing R.C.'s death and M.C.'s injuries." Given Rodriguez's failure to develop sufficient argument on appeal and his concession at trial of guilt on the DUI and aggravated assault charges, we affirm those convictions and sentences despite Rodriguez's claim that he moved for acquittal "on all charges." *See* Ariz. R. Civ. App. P. 13(a)(7); *Ritchie v. Krasner*, 221 Ariz. 288, ¶ 62 (App. 2009).

beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If reasonable people "may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial." *State v. Tison*, 129 Ariz. 546, 553 (1981) (quoting *State v. Bearden*, 99 Ariz. 1, 4 (1965)).

## A. Criminal Damage

**¶41** Rodriguez argues the state "presented no evidence regarding the value of the Malibu or the cost of damage other than establishing that it was 'totaled.'" He therefore contends his conviction for criminal damage was "not supported by substantial evidence and must be vacated." A person commits criminal damage by "[r]ecklessly defacing or damaging property of another person." A.R.S. § 13-1602(A)(1). Rodriguez's criminal damage conviction was designated a class five felony because the jury determined that the total amount of damage was "$2,000 or more but less than $10,000." *See* § 13-1602(B)(3). The state bears the burden of establishing the amount of damages and demonstrating the method used to calculate the amount. *State v. Brockell*, 187 Ariz. 226, 229 (App. 1996). If a defendant disputes the state's method, he or she can present evidence of what the defense deems a more accurate calculation, and the jury can decide which is the more reasonable method under the circumstances when determining the appropriate amount of damages. *Id.*

**¶42** In denying Rodriguez's Rule 20 motion on the criminal damage count, the trial court stated that "with the jury's common understanding of vehicles [and] what they cost, given the dollar amounts involved here," the evidence was sufficient. The court concluded that "how high up the jury can go" with the value determination was "well within the[] province of their common understanding." Rodriguez acknowledges that "no particular method of calculation is required to determine value" and "the jury is entitled to rely on its commonsense knowledge" when making determinations about damages. *See Brockell,* 187 Ariz. at 229. Nevertheless, he maintains the state was required to "at least present *some* evidence from which the jury could conclude that the loss was greater than $2,000, which it failed to do."

**¶43** Our supreme court has determined that "specific testimony of value is not always necessary if value may be inferred from other evidence, and the item is not so unique as to require expert valuation testimony." *State v. Spears*, 184 Ariz. 277, 290 (1996). In *Spears*, the court noted that the only valuation for the victim's stolen 1984 Dodge Rampage truck came from Spears, who had informed his girlfriend and police officers

that he had paid $3,000 for the truck. *Id.* But the court stated that given the circumstances of how Spears possessed the truck, "he was not qualified as the owner of the truck to give an opinion as to its value." *Id.* The court also noted there was testimony that the truck was in good condition and it "was operable because [the] defendant drove it until the time of his arrest." *Id.* The court concluded that "[b]ecause the truck in this case was not unique, we find that the state offered sufficient evidence at trial from which the jury could infer that the truck was worth between $750 and $1,500." *Id.*

¶44 In this case, the state presented evidence that R.C. was driving the Malibu just before the collision. It was therefore operable. Additionally, the state presented testimony that the Malibu was a total loss, and the trial court admitted photographs of the vehicle into evidence. From the photos, the jury could infer the condition of the vehicle prior to the collision. During closing arguments, the state acknowledged that the owner of the Malibu "wasn't able to provide a value" and that the jury needed to be "firmly convinced" that the value "falls within the bookends of that $2,000 to $10,000" in order to find Rodriguez guilty of criminal damage as a class five felony. The prosecutor further stated that "the evidence has proven, even in spite of a specific value [not] being given," that "the manner in which" the Malibu was totaled, while it "may not be $10,000," it was "at least $2,000."

¶45 Viewed in the light most favorable to sustaining the jury's verdict, as we are required to do, *see State v. Arredondo*, 155 Ariz. 314, 316 (1987), the photographic evidence and the testimony that the vehicle was "totaled" were sufficient to support the jury's finding that the damage was at least $2,000 but less than $10,000. Moreover, the criminal damage verdict form included three different ranges for "the total amount of damage caused" and the jury was instructed to "check only one." The ranges, listed in descending order, were: "$2,000 or more but less than $10,000"; "$1,000 or more but less than $2,000"; or "$250 or more but less than $1,000." Given the inherent imprecision that is represented by a "range," a specific dollar figure was not required to support Rodriguez's criminal damage charge. *See Brockell*, 187 Ariz. at 228 ("while there are generally accepted rules for calculating damage amounts, none of the rules guarantees a precise, formulaic application by the trier of fact," and the measure of damages chosen is one court deems most tailored to case). Here, the jury was given a broad range of potential valuations for the vehicle from $250 to $9,999. It determined the damage to the Malibu was at least $2,000, and we will not disturb that finding by reweighing the evidence. *See State v. Buccheri-Bianca*,

233 Ariz. 324, ¶ 38 (App. 2013). The trial court therefore did not err in denying Rodriguez's Rule 20 motion as to the criminal damage count. *See Mathers*, 165 Ariz. at 66.

## B. Unlawful Flight

**¶46** Rodriguez argues there was insufficient evidence to sustain his unlawful flight conviction because the state failed "to prove (1) he was aware of the deputy's presence, (2) that his failure to stop was willful, and (3) that the deputy was 'in pursuit.'"[14] We disagree.

**¶47** As previously noted, a person commits unlawful flight if, while driving a motor vehicle, the person "wil[l]fully flees or attempts to elude a pursuing official law enforcement vehicle" and the law enforcement vehicle is appropriately marked to show that it is a law enforcement vehicle. § 28-622.01; *see Martinez*, 230 Ariz. 382, ¶ 8. While not always required, the activation of emergency lights or the use of an audible siren may provide circumstantial evidence that a defendant was "'willfully' fleeing." *Martinez*, 230 Ariz. 382, ¶ 7; *see In re Joel*, 200 Ariz. 512, ¶¶ 7-8; *State v. Fiihr*, 221 Ariz. 135, ¶ 11 (App. 2008) ("[D]epending on the circumstance, use of a siren or other audible signal may not be necessary when pursuing a fleeing motor vehicle."). Additionally, any refusal to stop on command of an officer who is in an official police vehicle "violates the felony flight statute . . . even if that pursuit does not attain excessive speeds or involve reckless driving." *State v. Fogarty*, 178 Ariz. 170, 171 (App. 1993).

**¶48** Citing *Fogarty* and *Fiihr*, Rodriguez acknowledges that "Arizona courts have found evidence sufficient to sustain a conviction for unlawful flight even in the absence of evidence associated with a stereotypical pursuit or flight." *See Fogarty*, 178 Ariz. 170; *Fiihr*, 221 Ariz. 135. He attempts to distinguish his situation from *Fiihr* and *Fogarty* by arguing that "those cases have also involved overwhelming evidence establishing the defendant knew he was being pursued," whereas in his

---

[14]When the deputy arrived at the intersection after the accident, Rodriguez was "climbing out of the driver[-side] window" of his vehicle, but he quickly "fell to the ground" and was "in and out of consciousness." The state did not allege that Rodriguez fled or attempted to flee from the scene of the collision; the unlawful flight charge pertained only to Rodriguez fleeing from the deputy after the attempted traffic stop in the apartment complex parking lot.

case, he contends "substantial evidence was presented that suggested Rodriguez was unaware of the deputy."

¶49 To support this claim, Rodriguez contends that the deputy "testified that it did not appear that Rodriguez was aware of his presence behind him on [the surface streets], or that his reckless driving behavior was an attempt to elude [the deputy]." He further claims that "[e]ven after the deputy activated his lights, from his testimony, it appears he still had doubts as to whether Rodriguez was aware that he was attempting to stop him." But these arguments overlook the context in which the statements were made and ultimately request that we reweigh the evidence, which we will not do. *See Buccheri-Bianca*, 233 Ariz. 324, ¶ 38.

¶50 The state submitted as an exhibit the video of aerial surveillance footage from the airplane that had captured the majority of the deputy's encounter with Rodriguez in the apartment complex parking lot. On cross-examination, Rodriguez admitted he was the one "on the video" driving through the parking lot with the deputy "immediately behind [him] with . . . red and blue lights on" for "at least [fifty] seconds." He also confirmed that he had "slowed down, . . . pulled over to the right, and . . . stopped just long enough for the deputy to get out of his car and put his foot on the ground" before Rodriguez sped off. Additionally, Rodriguez admitted that he had been "concerned about driving home that evening" and that, after nearly rear-ending another car on his way back to the apartment complex, he had "realized [he] was maybe a little too drunk to drive."

¶51 On cross-examination at trial, the deputy confirmed that after Rodriguez "t[ook] off" from the attempted traffic stop at the apartment complex, he "immediately deactivated [his] overhead lights," transitioned from "active pursuit" to "active surveillance," and began observing Rodriguez "from a significant distance." When he was asked if it was "fair to say [he was] not pursuing the vehicle anymore," the deputy responded "[t]hat is not correct," explaining that even though he "was not physically pursuing" Rodriguez, "the Sheriff's Department was still pursuing th[e] vehicle" via the surveillance airplane.

¶52 Rodriguez agrees the deputy's testimony about his driving behavior moments before the attempted stop was "evidence that arguably suggested Rodriguez may have been aware that the deputy was attempting to stop him," but he maintains "that evidence was undercut by Rodriguez's testimony, which provided an explanation for that behavior." Indeed, although he did "not disput[e] what[ was] in the video," Rodriguez testified

that he "had no idea that there was a deputy in a Chevy Tahoe immediately behind [him th]at night" and insisted he never "s[aw the deputy's] red and blue lights on" nor "hear[d] his siren" because he "had the music real loud" in his car at the time. Rodriguez explained that in slowing down and pulling over to the right, he "w[as]n't stopping for [the deputy]"; rather, he was "stopping because [he] was looking for [his] phone and realized it was in [his] car somewhere." He also claimed that he "took off quickly" after coming to a complete stop because he was "frustrated" and once he "realized that [his] phone was in the car somewhere," he "just wanted to . . . go back home."

¶53 However, this alternative explanation for Rodriguez's conduct does not undermine the sufficiency of the evidence. *See State v. Landrigan*, 176 Ariz. 1, 4 (1993) (that reasonable minds could differ on inferences to be drawn does not render evidence insubstantial). Conflicting testimony creates a question of fact that is to be decided by the jury, *id.*, whose province we will not invade by reweighing evidence on appeal, *Buccheri-Bianca*, 233 Ariz. 324, ¶¶ 38-39. Viewed in the light most favorable to sustaining Rodriguez's convictions, the evidence presented was sufficient for a reasonable juror to conclude that Rodriguez was aware of the deputy's presence, and that his failure to stop was willful. *See Mathers*, 165 Ariz. at 66.

## C. Felony Murder

¶54 Rodriguez posits that even if we determine there was sufficient evidence to support his unlawful flight conviction, his conviction for felony murder is "insufficient on other grounds" because "it is clear in this case that R.C.'s death was not caused in the course of an unlawful flight from a pursuing officer." He argues that "even assuming the deputy's encounter with Rodriguez initially amounted to a pursuit," that pursuit "ended when the deputy turned off his lights and sirens and transitioned to surveillance mode." A death occurs in the course or furtherance of an underlying felony if it "resulted from an action taken to facilitate the accomplishment of the felony." *State v. Burns*, 237 Ariz. 1, ¶ 77 (2015) (quoting *State v. Jones*, 188 Ariz. 388, 397 (1997)). A close temporal relationship between the acts facilitating the underlying felony and the victim's death supports the finding of a valid predicate felony for a first-degree murder charge. *See Jones*, 188 Ariz. at 397-98. "Whether a death is 'in furtherance' of an underlying felony is ordinarily a question to be determined by the trier-of-fact." *State v. Herrera*, 174 Ariz. 387, 394 (1993).

¶55        As a preliminary matter, Rodriguez does not cite to, and we are not aware of, any controlling caselaw that supports his claim that a pursuit "ends" when a police officer deactivates his lights, his siren, or both. In *Fogarty*, we held that an officer is not required to continue the pursuit if he deems it unnecessary or a risk to public safety. *See* 178 Ariz. at 171-72. The officer in *Fogarty* expressly "gave up the chase" at the city limits, and the defendant "was later arrested at his home." *Id.* at 171. And although the defendant was "stopping at stop lights and otherwise obeying the traffic laws," we held that his "refusal to stop on command" of an officer who was driving a police car "violate[d] the felony flight statute because of the potential for personal danger inherent in vehicular pursuit." *Id.* Here, as in *Fogarty*, the deputy testified that while he could have "put the pedal to the metal and chased after [Rodriguez]," he made the "decision to essentially let [the vehicle] go, [and] let the plane deal with it" because "there was no reason to put the public in danger."

¶56        The fact that the deputy transitioned to "active surveillance" immediately prior to the collision did not sever the causal connection between R.C.'s death and Rodriguez's predicate felony of unlawful flight. *See State v. Richmond*, 112 Ariz. 228, 232 (1975). Under Arizona's felony murder rule, "there is no requirement that the killing occur, while committing or while engaged in the felony, or that the killing be a part of the felony other than that the few acts be a part of one continuous transaction." *Id.* (quoting *People v. Stamp*, 82 Cal. Rptr. 598, 602 (Ct. App. 1969)). Here, the "felony and the murder were part of the same series of events," and thus there was a "sufficient link" between Rodriguez's unlawful flight and R.C.'s death to uphold a felony-murder conviction. *Id.*

¶57        In sum, "pursuit" for the purposes of unlawful flight does not require evidence that officers were "chasing" the defendant with lights and sirens activated at the exact moment the defendant causes the death of another person. *See Fogarty*, 178 Ariz. at 171-72; *Fiihr*, 221 Ariz. 135, ¶ 11. The state presented sufficient evidence for a reasonable jury to conclude that by driving from the attempted traffic stop, Rodriguez "wil[l]fully fle[d]" from a "pursuing official law enforcement vehicle," § 28-622.01, and in the course and furtherance of that flight, Rodriguez killed R.C., *see* § 13-1105(A)(2); *Mathers*, 165 Ariz. at 66. The short span of time between Rodriguez's flight from the attempted traffic stop and the fatal collision further supports the jury's determination that R.C.'s death occurred in the course of the unlawful flight. *See Jones*, 188 Ariz. at 397-98. The trial court did not err in denying Rodriguez's Rule 20 motion on the felony murder count. *See Mathers*, 165 Ariz. at 66.

## V. Propriety of Life Sentence for Felony Murder

**¶58**        Rodriguez argues that the imposition of a life sentence for his felony murder conviction is "cruel and unusual in violation of the United States and Arizona constitutions."[15]   We review de novo whether a defendant's sentence complies with the Eighth Amendment.  *State v. Jerald*, 257 Ariz. 342, ¶ 23 (App. 2024).  Rodriguez preserved the issue by objecting below, so our review is for harmless error.  *See Henderson*, 210 Ariz. 561, ¶ 18.

**¶59**        The Eighth Amendment's prohibition against "cruel and unusual punishments" protects individuals from being subjected to excessive sanctions and ensures that punishment for a crime is "graduated and proportioned to the offense."  *State v. Berger*, 212 Ariz. 473, ¶ 8 (2006) (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005)).   There is no requirement for strict proportionality between crime and sentence.  *Id.* ¶ 13. Rather, the provision forbids extreme sentences that are "grossly disproportionate," and only in "'exceedingly rare' cases will a sentence to a term of years violate the Eighth Amendment."  *Id.* ¶¶ 10, 17 (quoting *Ewing v. California*, 538 U.S. 11, 22-23 (2003)).

**¶60**        Rodriguez argues § 13-1105 is "cruel and unusual insofar as it requires a mandatory life sentence for felony murder based on unlawful flight" because Arizona's unlawful flight statute "covers a broad range of conduct" that "is not limited to high-speed chases," but "also includes the mere refusal to stop for a pursuing officer."[16]   However, in Arizona, a

---

[15]Rodriguez also argues that his life sentence violates article II, § 15 of the Arizona Constitution, the state corollary to the Eighth Amendment of the United States Constitution.  Because the state provision is identical to and provides no greater protection than its federal counterpart, we address both claims in our Eighth Amendment analysis.  *See State v. Davis*, 206 Ariz. 377, ¶ 12 (2003).

[16]Rodriguez claims Arizona law offers "no sentencing discretion for felony murder" because "courts have no choice but to impose a mandatory life sentence without the possibility of release for [twenty-five] years."  This is an inaccurate representation of Arizona's sentencing statute, which provides that if a "defendant is convicted of first-degree murder pursuant to § 13-1105[(A)(2)]," the court has the discretion "to impose a sentence of life or natural life."  A.R.S. § 13-752(A).  Rodriguez was sentenced to the lesser of the two options—a sentence of life with the possibility of release

sentence imposed under the felony murder statute is not unconstitutional simply by virtue of the type of felony on which it is predicated. *Cf. State v. Celaya*, 135 Ariz. 248, 254 (1983) (no "strained application" of felony murder rule where defendant was found guilty of felony robbery). Moreover, "[i]n comparing the gravity of the offense to the harshness of the penalty," we afford substantial deference to the legislature's judgment, and a sentence does not violate the Eighth Amendment if the legislature has a reasonable basis for believing the sentencing scheme furthers penological goals and reflects a rational legislative intent. *Berger*, 212 Ariz. 473, ¶¶ 13, 17.

¶61 While Rodriguez concedes his "offense was undoubtedly serious and warrants substantial punishment," he maintains his conduct does not "warrant a life sentence" because he "did not intentionally cause the collision or R.C.'s death." However, in *State v. McLoughlin*, 139 Ariz. 481, 485-86 (1984), our supreme court squarely addressed and rejected this argument:

> [T]he *mens rea* necessary to satisfy the premeditation element of [felony] first-degree murder is supplied by the specific intent required for the [relevant underlying] felony. We reject [the] claim that this is unconstitutional. It is not unconstitutional for the Arizona legislature to mandate that an individual who causes the death of another while seeking to accomplish one of several enumerated felonies . . . be subject to the same criminal charges and punishment as a person who causes the death of another person with premeditation.

¶62 "We are bound by decisions of the Arizona Supreme Court and have no authority to overrule, modify, or disregard them." *Myers v. Reeb*, 190 Ariz. 341, 342 (App. 1997) (quoting *City of Phoenix v. Leroy's Liquors, Inc.*, 177 Ariz. 375, 378 (App. 1993)). Here, Rodriguez was found guilty of unlawful flight, which is one of the enumerated predicate felonies for felony murder. *See* § 13-1105(A)(2). The imposition of a first-degree murder sentence thus does not violate Rodriguez's constitutional rights.

---

after twenty-five years. Thus, the trial court both recognized and exercised the sentencing discretion available given Rodriguez's conviction.

*See* A.R.S. §§ 13-752(A); 13-1105(B); § 28-622.01(A)(1); *see also State v. Moore*, 218 Ariz. 534, ¶ 8 (App. 2008).

**¶63** Rodriguez also argues his life sentence is cruel and unusual because "offenders who commit crimes similar to [his] are more frequently charged and convicted of second-degree murder or manslaughter, even in cases involving flight."[17] However, it is only once "an inference of gross disproportionality" is found that we will in engage in a comparison between "the sentences the state imposes on other crimes and the sentences other states impose for the same crime." *Berger*, 212 Ariz. 473, ¶ 12. Because we find no such threshold showing here, no further inquiry is required. Moreover, choosing which offense to charge rests within the duty and discretion of the prosecutor, and we generally will not disturb that decision on review. *See State v. Gooch*, 139 Ariz. 365, 365 (1984); *State v. Murphy*, 113 Ariz. 416, 418 (1976) (courts have no power to interfere with prosecutor's exercise of discretion unless prosecutor is "acting illegally or in excess of his powers"). There was no error in the imposition of Rodriguez's life sentence, constitutional or otherwise.

**Disposition**

**¶64** For the foregoing reasons, we affirm Rodriguez's convictions and sentences.

E C K E R S T R O M, Presiding Judge, concurring in part and dissenting in part:

**¶65** In a criminal damage case, the state has the burden of establishing the amount of damage and the method of calculating that amount. *State v. Brockell*, 187 Ariz. 226, 229 (App. 1996). And, to survive a judgment of acquittal on the amount of damage, the state must present substantial evidence to prove the value of that loss. *See* Ariz. R. Crim. P. 20(a)(1). Substantial evidence is "such proof that reasonable persons could

---

[17]To support this contention, Rodriguez cites two unpublished memorandum decisions, which are not binding on this court and do not persuade us to reach a different conclusion. *See* Ariz. R. Sup. Ct. 111(c)(1)(C) ("Memorandum decisions of Arizona state courts are not precedential and such a decision may be cited only for persuasive value . . . .").

accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *Parker*, 231 Ariz. 391, ¶ 70.

¶66        Here, the state presented evidence that the car had been "totaled." This would allow the jury to reasonably conclude that the amount of damage would be the fair market value of the car before the collision. But the state presented no testimony whatsoever about that value, much less any "method" of calculating it. And, although "specific testimony of value is not always necessary if value may be inferred from other evidence," *Spears*, 184 Ariz. at 290, the state presented little evidence from which the jury could make such inferences. The combination of testimony and photographs demonstrated only that the car was an operable Chevrolet Malibu that appeared to have interior upholstery in good condition.[18] In my view, such sparse evidence falls short of anything this court should characterize as substantial. In essence, the state asked the jury to conclude, beyond a reasonable doubt, that all operable Chevrolet Malibus with good upholstery must be worth at least $2,000.

¶67        Although the make and model of the car and the condition of its upholstery are relevant to its value, the state failed to present any evidence addressing a host of other important factors. How old was the car? How many miles had it been driven during its life? What was the mechanical condition of its engine before the collision? Did the car have a clean or salvage title? In the absence of a collision, would it have needed expensive repairs in the near future? The jury was left to wholly speculate on all of these basic questions, each potentially pivotal in determining a vehicle's value.

¶68        Our supreme court has insisted that evidence of an item's value be more substantial to sustain a criminal conviction. In determining the value of stolen items in a theft case, the court found testimony that a wedding band was "pure gold" insufficient to support that its market value was over $60. *State v. Rushing*, 156 Ariz. 1, 4 (1988); *see also State v. Grannis*,

---

[18]I cannot agree with my colleagues that the overall condition of the car can be reasonably inferred from the post-collision photos. Those photos show paint discolorations around the wheel well on the non-collision side of the vehicle and the absence of a hubcap on the collision side. The state leaves the jury to speculate about whether these blemishes were caused by the accident or were pre-existing. Most importantly here, the photographs in evidence shed no light on the pre-collision mechanical condition of the engine. Nor do they show the mileage on the car's odometer.

183 Ariz. 52, 57 n.1 (1995) (circumstantial evidence that victim visited ATM to withdraw $200 was insufficient evidence to show total contents of stolen wallet worth over $1,500). The court so found although the state had presented arguably the most important piece of information in determining the ring's value. The state's presentation here failed to clear even that bar, as it presented no substantial evidence of the vehicle's age, mileage, or overall mechanical condition.

**¶69** The majority finds support for its contrary conclusion in *Spears*, 184 Ariz. at 290 (holding state offered sufficient evidence to infer value of truck). There, however, the state offered more than mere evidence of the vehicle's operability and condition of its upholstery. It presented the model year of the truck, testimony from a person familiar with the truck that it was in "good condition," and the defendant's own valuation of the truck as being worth approximately $3,000. *Id.* Those additional facts—which included the age of the vehicle and a knowledgeable opinion that implicitly included an assessment of its mechanical condition—provided reasonable bases for inferences not available to the jury in the instant case.

**¶70** For the foregoing reasons, I would hold that the state presented insufficient evidence of damage to support a verdict of guilt as to the criminal damage count. I concur with the well-reasoned majority opinion in all other respects.